Isom HARRIS, Willie Minor, and Eddie Pugh, Plaintiffs,

v.

INTERNATIONAL PAPER CO., Defendant.

Civ. No. 89–0216–P.

United States District Court, D. Maine.

March 28, 1991.

Curtis Webber, Auburn, Me., for plaintiffs.

S. Mason Pratt, James Erwin, Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, Me., for defendant.

## OPINION AND ORDER

GENE CARTER, Chief Judge.

This matter comes before the Court for factfinding and final resolution of claims by Plaintiffs Isom Harris, Willie Minor, and Eddie Pugh, each of whom is black, that Defendant International Paper Company discriminated against them because of their race in violation of the Maine Human Rights Act (hereinafter MHRA), 5 M.R. S.A. § 4551 *et seq.* A trial was held before

a jury from July 11, 1990 to July 25th, 1990 on three claims: (1) breach of contract, (2) violation of 42 U.S.C. section 1981, and (3) violation of the MHRA. The MHRA claim, because it affords only equitable relief, was reserved for decision from the bench consistent with Maine civil rights law practice. *See Maine Human Rights Commission v. City of Auburn*, 408 A.2d 1253, 1261 (Me.1979) ("An action arising under the Human Rights Act is equitable in nature, and any relief thereunder is granted only through the exercise of the sound discretion of a judge"). *Cf. Great American Federal Savings and Loan Association v. Novotny*, 442 U.S. 366, 375, 99 S.Ct. 2345, 2350, 60 L.Ed.2d 957 (1979) (no jury trial right under Title VII); *Lorillard v. Pons*, 434 U.S. 575, 583–84, 98 S.Ct. 866, 871–72, 55 L.Ed.2d 40 (1978) (same). The Court directed a verdict at the close of Plaintiffs' case-in-chief on the claimed violation of section 1981 consistent with *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), as explained by *Malhotra v. Cotter & Co.*, 885 F.2d 1305 (7th Cir.1989).

The jury issued special verdicts on the breach of contract claims as follows:

(1) Defendant entered into a contract with each Plaintiff to provide each Plaintiff with the training necessary to qualify for promotion to higher positions on Defendant's paper machines.[1]

(2) Defendant breached its contract with each Plaintiff.

(3) Defendant's breach caused damages to each Plaintiff in the amount of $55,000.

Jury Verdict Forms (Docket Nos. 32, 33, & 34). The Court must now issue findings of fact[2] on the question of Defendant's liability under the MHRA which are consistent with the jury's special verdicts. Should the resulting verdict on the MHRA claims favor Plaintiffs, the Court must determine whether appropriate remedies are available consistent with the jury's award of damages.[3]

## I. THE LEGAL FRAMEWORK UNDER THE MHRA

Count I of Plaintiffs' complaint advances two discrete theories supporting Plaintiffs' claims that Defendant violated the MHRA. First, the complaint alleges that each Plaintiff was a victim of "disparate treatment," on account of his race, in Defendant's withholding of training and promotions to which Plaintiffs were entitled. Second, the complaint alleges that Plaintiffs were victims of "racial harassment" in Defendant's paper mill which Defendant did not remedy, even though Defendant allegedly had knowledge of the harassment.

The MHRA was intended by the Maine legislature to be the state analogue to Title VII, and the judicial construction of federal antidiscrimination law has, as a result, long been adverted to by the Law Court as persuasive authority for the interpretation of the MHRA. *Maine Human Rights Commission v. City of Auburn*, 408 A.2d at 1261; *Greene v. Union Mutual Life*

---

**1.** The Court granted a directed verdict on the question of whether Defendant entered into a contract *to promote* Plaintiffs after they arrived at the Jay mill. Transcript at 866–67 (hereinafter Tr.).

**2.** The Court reads Federal Rule of Civil Procedure 52 to *require* special findings of fact "[i]n all actions tried upon the facts without a jury or with an advisory jury...." Fed.R.Civ.P. 52(a).

**3.** The parties agree that the Court is bound by the jury's determination of factual issues which are common to both their legal and equitable claims. Plaintiffs' Memorandum of Law Regarding Claims under Maine Human Rights Act at 1–2 (Docket No. 20M); Defendant's Post–Trial Brief at 3–5. The parties cite substantial author-

ity to support this proposition, including *Curtis v. Loether*, 415 U.S. 189, 196 n. 11, 94 S.Ct. 1005, 1009, n. 11, 39 L.Ed.2d 260 (1974); *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 470–73, 82 S.Ct. 894, 895–98, 8 L.Ed.2d 44 (1962); *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959); *Skinner v. Total Petroleum, Inc.*, 859 F.2d 1439, 1444–45 (10th Cir.1988); *Lincoln v. Board of Regents of the University of Georgia*, 697 F.2d 928, 934 (11th Cir.), *cert. denied*, 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983); and many other cases. The Court concludes that this proposition is universally accepted, and not inconsistent with the law of this circuit. *See generally Santiago–Negron v. Castro–Davila*, 865 F.2d 431, 437–42 (1st Cir.1989).

*Insurance Co.*, 623 F.Supp. 295, 298–99 (D.Me.1985). Federal antidiscrimination precedent will, therefore, guide this Court, as it would the Law Court, in analyzing these two theories.

### A. Disparate Treatment

The framework for employment discrimination claims based on allegations of disparate treatment was set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).[4] The plaintiff bears the ultimate burden of persuasion by a preponderance of the evidence. *Burdine*, 450 U.S. at 255–56, 101 S.Ct. at 1094–95. The plaintiff's initial burden, however, is to establish a four-part *prima facie* case: (1) that the plaintiff belongs to a protected group, (2) that he applied and was qualified for a job for which the employer was seeking applicants, (3) that he was rejected despite his qualifications, and (4) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of plaintiff's qualifications. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824.

Once the plaintiff has established his *prima facie* case, the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the plaintiff's rejection. *Id.* *See also Loeb v. Textron, Inc.*, 600 F.2d 1003, 1011–12 (1st Cir.1979) (explaining further the defendant's burden of production). The defendant can satisfy this burden of production with "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Burdine*, 450 U.S. at 257, 101 S.Ct. at 1096. *See also Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 109 (1st Cir.1988). Should the defendant succeed, the legally mandatory inference of discrimination which arose from the *prima facie* case disappears from the case, although the plaintiff's evidence and inferences reasonably drawn therefrom may be considered by the fact finder in the ultimate determination of the case. *Burdine*, 450 U.S. at 255 & n. 10, 101 S.Ct. at 1095 & n. 10. Finally, the plaintiff has the opportunity to demonstrate that the defendant's purported nondiscriminatory reasons are mere pretexts for discrimination. The plaintiff may succeed "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256, 101 S.Ct. at 1095. *See also McDonnell Douglas*, 411 U.S. at 804–05, 93 S.Ct. at 1825–26.

### B. Racial Harassment

Racial harassment cases are analyzed differently. The *prima facie* case for racial harassment under the MHRA consists of three elements:

(1) unwelcome comments, jokes, acts and other verbal or physical conduct of a racial nature in the workplace; and

(2) the existence of any of the three following circumstances:

> (i) submission to such conduct is implicitly or explicitly made a term or condition of an individual's employment; or,

> (ii) submission to or rejection of such conduct by an individual is used as a basis for employment decisions affect-

---

**4.** The Court notes the First Circuit's warning not to approach this antidiscrimination analysis in a fixed and rigid manner:

> Courts and litigants must bear in mind that the critical determination in any Title VII suit is whether the complainant has proven by a fair preponderance of the evidence that an impermissible consideration ... was a substantial motivating factor in the adverse employment decision. That principle requires the trial court at case's end ... to focus not on

the artificial striations of the burden-shifting framework, but on "the district court's ultimate finding of discrimination *vel non*."

*Cumpiano v. Banco Santander Puerto Rico*, 902 F.2d 148, 155 (1st Cir.1990) (citation omitted).

The Court also notes the Maine Human Rights Commission's directive that "the remedial provisions of the [MHRA] shall be given broad construction and its exceptions construed narrowly." Me. Human Rights Comm'n Reg. 3.01(C)(1).

ing such individual (*"quid pro quo"* harassment); or,

(iii) such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment ("hostile environment" harassment); and

(3) the employer, or its agents or supervisory employees, knows or should have known of the conduct.

Me. Human Rights Comm'n Reg. 3.09(F)(1). The employer-defendant may rebut the *prima facie* case by showing that it took "immediate and appropriate corrective action." Me. Human Rights Comm'n Reg. 3.09(F)(2).[5]

█ The Supreme Court has cautioned that not all harassment violates antidiscrimination law: "For ... harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986) (quoting *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir.1971)).[6] The first question which must be answered, therefore, is what standard is applied by a fact finder to assess whether particular conduct or speech is "unwelcome," and whether that harassment is sufficiently severe and pervasive to violate antidiscrimination law. Unfortunately, the Court of Appeals for the First Circuit has not provided a clear and consistent answer to this question.

In *Lipsett v. University of Puerto Rico*, 864 F.2d 881 (1st Cir.1988), the First Circuit recognized that there may be two different perspectives on the questions of unwelcomeness and pervasiveness: the perpetrator's perspective and the victim's perspective. When considering allegations of sexual harassment, therefore, "the fact finder keeps both the man's and woman's perspective in mind" so that defendants and courts will not " 'sustain ingrained notions of reasonable behavior fashioned by the offenders.' " *Id.* at 898 (quoting *Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 626 (6th Cir.1986) (Keith, J., dissenting)). But in *Morgan v. Massachusetts General Hospital*, 901 F.2d 186 (1st Cir.1990), the First Circuit apparently ignored *Lipsett's* "two perspectives approach" and applied a "reasonable person" standard to the questions of unwelcomeness and pervasiveness. *Id.* at 192–93.[7] In *Chamberlin v. 101 Realty, Inc.*, 915 F.2d 777 (1st Cir.1990), which also involved sexual harassment, the First Circuit held that satisfying the requirement of unwelcomeness "necessitates a finding that the advances were uninvited and offensive or unwanted *from the standpoint of the employee.*" *Id.* at 784 (emphasis added).

The different standards applied in *Chamberlin* and *Lipsett*, on the one hand, and *Morgan*, on the other hand, appear to the Court to be facially irreconcilable. The Court will thread the doctrinal needle as best it can by attempting to divine the essence of judicial purpose which underlies all these holdings. Sorting out the apparent difference between *Chamberlin* and *Lipsett* can be accomplished by carefully considering the relationship between the two elements which make up the core of a hostile environment racial harassment

---

**5.** Because the Maine Law Court relies upon federal antidiscrimination precedent when interpreting the MHRA, and the above quoted Employment Regulation is clearly based on the federal Equal Employment Opportunity Commission's regulations defining sexual harassment under Title VII, *see* 29 C.F.R. § 1604.11 (1990), the Court turns to Title VII jurisprudence for elaboration on these elements of a racial harassment claim under Maine law.

**6.** The First Circuit recognized the availability of a cause of action for racial harassment under Title VII in *De Grace v. Rumsfeld,* 614 F.2d 796, 803 (1st Cir.1980) ("An employer may not stand by and allow an employee to be subjected to a course of racial harassment by co-workers, and thus defendants must accept responsibility for their supervisors' derelictions, if such existed, in responding to the racial problem....")

**7.** Ironically, the *Morgan* court cited the majority opinion in *Rabidue v. Osceola Refining Co.,* 805 F.2d 611 (6th Cir.1986), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987), on the questions of unwelcomeness and pervasiveness, while the *Lipsett* court cited the dissent in that same case on the same questions. Needless to say, the *Rabidue* majority's perspective cannot be reconciled with that of the dissent.

claim: (1) unwelcome, pervasive racial conduct or speech affecting the terms and conditions of the victim's employment, and (2) knowledge by the employer.[8]

Since employers cannot be expected to respond to the concerns of hypersensitive employees, some objective standard of unwelcomeness and pervasiveness must be applied. *Lipsett* described two differing perspectives:

> A male supervisor might believe, for example, that it is legitimate for him to tell a female subordinate that she has a "great figure" or "nice legs." The female subordinate, however, may find such comments offensive.... The man must be sensitive to signals from the woman that his comments are unwelcome, and the woman, conversely, must take responsibility for making those signals clear.... Unless the fact finder keeps both the man's and the woman's perspective in mind, "defendants as well as the courts [will be] permitted to sustain ingrained notions of reasonable behavior fashioned by the offenders...."
>
> *Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 626 (6th Cir.1986) (Keith, J., dissenting), *cert. denied*, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987).

At first glance, *Lipsett* appears to require that fact finders apply an objective standard for assessing unwelcomeness and pervasiveness which takes into account both the perpetrator's perspective and the victim's perspective. But such a formulation, as the First Circuit's own hypothetical illustration makes clear, would often leave a fact finder with two irreconcilable conclusions and, as a result, no means of deciding questions of liability. The First Circuit cannot have intended such a confused result. A better interpretation of *Lipsett* must be available.

In *Chamberlin* and *Lipsett*, the purveyors of the offensive conduct and speech were supervisors and, therefore, agents of the employer. This fact suggests that the *Lipsett* court intended to implicate the second element of a hostile environment claim—the question of whether the employer-defendant had knowledge or should have had knowledge of the harassment—in its "two perspectives" approach. Simply, the First Circuit recognized that the question of whether the employer had or should have had knowledge of the harassment could be answered by determining whether *the harassing supervisors*, as agents of the employer-defendant, knew or should have known that their conduct created a hostile work environment. Because the harassment victims made no direct complaints to the harassing supervisors or to other agents of the employers, the First Circuit in *Chamberlin* and *Lipsett* looked to the victims' responses to the offensive conduct to see if those responses communicated or should have communicated to the harassing supervisors that they were engaging in harassment. *Chamberlin*, 915 F.2d at 784; *Lipsett*, 864 F.2d at 898.[9] In addition, the quality and quantity of the conduct and speech was relevant to the First Circuit's inquiry into the employer's state of knowledge on the theory that some conduct and speech is so offensive that a reasonable person could not believe that the conduct or speech constitutes anything other than harassment.

The same inquiry would be undertaken when the harasser is a co-worker, rather than a supervisor, and the victim has not

---

8. The second element of a hostile environment claim—employer's knowledge—permits an assessment of whether it is fair and just under the circumstances to assign liability to an employer for acts it neither expressly authorized nor intended. *See De Grace v. Rumsfeld*, 614 F.2d 796, 803 (1st Cir.1980) ("An employer may not stand idly by and allow an employee to be subjected to a course of racial harassment by co-workers...."). *Cf. Meritor*, 477 U.S. at 69–72, 106 S.Ct. at 2406–08 (holding that employers are not strictly liable for a hostile environment created by their employees).

9. Victims are under no obligation to notify their employers of hostile environment harassment. *Lipsett*, 864 F.2d at 900–01 (citing *Meritor*, 477 U.S. at 72, 106 S.Ct. at 2408). However, victims who do not inform their employers that harassment exists in the workplace run a risk that the employer-defendant will not learn of the harassment from another source and will not be charged with circumstantially imputed knowledge of the harassment.

complained directly to the employer about the harassment. The fact finder might again consider the victim's responses to the harassment to determine whether the victim's conduct effectively communicated or should have communicated the fact of the harassment *to the employer.* The fact finder might also consider the quantity and quality of the challenged conduct and speech on the theory that substantial racial or sexual strife in a workplace should be known to an employer.

■ Thus, there is a better construction of *Lipsett*'s "two perspectives" approach. The perpetrator's perspective on whether conduct or speech is unwelcome and pervasive is relevant, *but only to the fact finder's consideration of the employer's knowledge or circumstantially imputed knowledge.* The question of whether conduct and speech rises to the level of harassment, putting aside the question of the employer's knowledge, must be considered only from the employee/victim's perspective. *Accord Chamberlin,* 915 F.2d at 784 ("unwelcomeness" is judged "from the standpoint of the employee"); *see also Henson v. City of Dundee,* 682 F.2d 897, 903 (11th Cir.1982) (defining as "unwelcome" conduct that the employee did not solicit or incite, and "that *the employee regarded* ... as undesirable or offensive) (emphasis added); *Rogers v. EEOC,* 454 F.2d 234, 238 (5th Cir.1971) (the seminal case on hostile environment claims, holding that Title VII protects *"employees'* psychological as well as economic fringes" from discrimination) (emphasis added), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972).

The construction of *Lipsett* originally hypothesized would have required the fact finder to take into consideration the harasser's view of whether his conduct is offensive. But state and federal laws prohibiting racial and sexual harassment are wholly uninterested in the perpetrator's intent. Victims need establish neither the fault nor the discriminatory intent of their employers

and co-workers to succeed under Title VII or the MHRA. Antidiscrimination law is concerned only with the effects of conduct and speech on victims from protected groups. Me. Human Rights Comm'n Reg. 3.09(F)(1) (prohibiting conduct which "has the purpose *or effect* of substantially interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment") (emphasis added); 29 C.F.R. § 1604.11(a)(3) (also prohibiting conduct which "has the purpose *or effect* of unreasonably interfering....") (emphasis added); *Rogers,* 454 F.2d at 239 ("Title VII is aimed at the *consequences or effects* of an employment practice and not at the ... motivation" which inspired the practice) (emphasis added). To give full force to this basic premise of antidiscrimination law, and to *Lipsett*'s recognition of the differing perspectives which exist in our society, the standard for assessing the unwelcomeness and pervasiveness of conduct and speech must be founded on a fair concern for the different social experiences of men and women in the case of sexual harassment, and of white Americans and black Americans in the case of racial harassment. *Lipsett,* 864 F.2d at 898. Several courts, after carefully considering these issues, have held that the appropriate objective standard for judging gender-related conduct is a "reasonable woman" standard. *See, e.g., Ellison v. Brady,* 924 F.2d 872, 877–79 (9th Cir.1991); *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1482 (3rd Cir.1990); *Yates v. Avco Corp.,* 819 F.2d 630, 637 (6th Cir.1987); *Rabidue,* 805 F.2d at 626 (Keith, J., dissenting); [10] *Robinson v. Jacksonville Shipyards, Inc.,* 760 F.Supp. 1486 (M.D.Fla.1991). The same understanding must be brought to cases involving race-related conduct.

■ Black Americans are regularly faced with negative racial attitudes, many unconsciously held and acted upon, which are the natural consequences of a society ingrained with cultural stereotypes and race-based beliefs and preferences. *See*

---

10. Since the First Circuit cited Judge Keith's dissent approvingly in *Lipsett,* the Court infers that the "reasonable woman" standard advanced by Judge Keith in his dissent is consistent with the law of this circuit.

generally Lawrence, *The Id, the Ego, and Equal Protection: Reckoning with Unconscious Racism*, 39 Stan.L.Rev. 317 (1987).[11] As a result, instances of racial violence or threatened violence which might appear to white observers as mere "pranks" are, to black observers, evidence of threatening, pervasive attitudes closely associated with racial jokes, comments or nonviolent conduct which white observers are also more likely to dismiss as non-threatening isolated incidents. Matsuda, *Public Response to Racist Speech: Considering the Victim's Story*, 87 Mich.L. Rev. 2320, 2326–35 (1989). The omnipresence of race-based attitudes and experiences in the lives of black Americans causes even nonviolent events to be interpreted as degrading, threatening, and offensive. *See, e.g.,* D. Bell, AND WE ARE NOT SAVED (1987) 181–85 (describing a fictional encounter with a state trooper); Williams, *Alchemical Notes: Reconstructing Ideals from Deconstructed Rights*, 22 Harv.C.R.–C.L.L.Rev. 401, 406–13 (1987) (explaining why black and white apartment-seekers assume different perspectives on the formalities of renting an apartment). Even an inadvertent racial slight unnoticed either by its white speaker or white bystanders will reverberate in the memory of its black victim. Lawrence, *supra* at 339–41. Since the concern of Title VII and the MHRA is to redress the effects of conduct and speech on their victims, the fact finder must "walk a mile in the victim's shoes" to understand those effects and how they should be remedied. In sum, the appropriate standard to be applied in this hostile environment racial harassment case is that of a "reasonable black person."[12]

The First Circuit Court of Appeals' position on the question of when an employer is charged with the knowledge or circumstantially imputed knowledge of its "agents or supervisory employees" is much clearer. While common law principles of agency should provide guidance in determining the knowledge with which an employer should be charged, *Meritor,* 477 U.S. at 72, 106 S.Ct. at 2408, the Court of Appeals has rejected "strict adherence to agency principles." *Lipsett,* 864 F.2d at 900. Employers are liable for hostile environment harassment both by their supervisors and by the victim's co-workers if "an official representing that institution knew, or in the exercise of reasonable care, should have known, of the harassment's occurrence, *unless* that official can show that he or she took appropriate steps to halt it." *Id.* at 901 (emphasis in original). The availability of a grievance procedure and a policy against discrimination, coupled with the victim's failure to seek redress, is insufficient to shield the employer from liability. *Id.* at 900.

## II. FINDINGS OF FACT ON HOSTILE ENVIRONMENT RACIAL HARASSMENT

There is no dispute between the parties or in the record as to the following facts. Plaintiffs were employed by Defendant at its paper mill in Mobile, Alabama when the unionized workers at Defendant's mill in Jay, Maine undertook a strike on June 16, 1987. Plaintiffs were hired as permanent replacement workers for Defendant's Jay mill in July, 1987 and began their jobs that same month. Plaintiffs'

---

**11.** Because these racial beliefs and stereotypes pervade our society, employing a "reasonable person" standard would permit discriminatory conduct and speech constructed on the foundation of these beliefs and stereotypes to stand unremedied. *See Lipsett,* 864 F.2d at 898 (quoting *Rabidue,* 805 F.2d at 626 (Keith, J. dissenting)).

**12.** The Court does not mean to imply that there is unanimity of perspective among black Americans. *See, e.g.,* J. Scales–Trent, *Black Women and the Constitution: Finding Our Place, Asserting Our Rights,* 24 Harv.C.R.–C.L.L.Rev. 9 (1989)

(discussing how black women suffer discrimination of a different form, quality, and intensity than that experienced either by black men or white women). The appropriate standard to be applied in hostile environment harassment cases is that of a reasonable person from the protected group of which the alleged victim is a member. In this instance, because Plaintiffs are black, the appropriate standard is that of a reasonable black person, as that can be best understood and given meaning by a white judge.

Proposed Finding of Facts at 2–3 (hereinafter Ps' Facts); Defendant's Proposed Findings of Facts at 4, 10, 13 (hereinafter D's Facts). The jury found that Plaintiffs' hiring commenced pursuant to a contract entitling Plaintiffs to training necessary to qualify Plaintiffs for promotions.

Plaintiff Harris was assigned to the Number 2 paper machine at the Jay mill, while Plaintiff Pugh worked on the Number 3 machine and Plaintiff Minor was assigned to the Number 5 machine. Ps' Facts at 3; D's Facts at 4, 10, 13.[13] Harris was hired as a "third hand," Pugh as a "fourth hand," and Minor as a "fifth hand." Ps' Facts at 2–3; D's Facts at 4, 10, 13. The record reflects no dispute over the fact that all of the jobs in the Jay mill above third hand were held by supervisory and management personnel at the time of Plaintiffs' hirings.

The following lines of progression, listed from highest to lowest position of authority, existed on Defendant's paper machines before October 19, 1988: Machine Tender, Back Tender, Third Hand, Coater Operator, Fourth Hand, Fifth Hand, Sixth Hand, Utility.[14] After October 19, 1988, the lines of progression were as follows: Operator (formerly Machine Tender and Back Tender), Service Operator I (formerly Third Hand), Service Operator II (formerly Coater Operator and Fourth Hand), Process Specialist (formerly Fifth Hand and Sixth Hand), Trainee (formerly Utility). Defendant's Exhibits 12, 13, 14, & 15.[15] After Project:

Productivity was implemented on October 19, 1987, Harris was classified as a Service Operator I, Pugh as a Service Operator II, and Minor as a Process Specialist. Ps' Facts at 4, 6, 7.[16]

### A. Harris and Racial Harassment

Plaintiff Harris was forced to run a gauntlet of racial abuse from the time of his arrival at the Jay mill. Harris's principal harassers were Dwight Goff, a "loaned supervisor" brought to Maine from one of Defendant's southern mills to assist during the strike, and Birchard and Kip Brooks, who were permanent replacement workers. Goff's racist views, including the use of epithets like "lazy nigger" and "black son-of-a-bitch," were well known to other workers in the mill. Tr. at 161–62. Goff regularly expressed his hatred of black people in Harris's presence, Tr. at 251, and sabotaged Harris's work. Tr. at 87–88. And even though Goff was charged with training the replacement workers on Number 2 machine, Goff declared that Harris would never advance and withheld training from him which was necessary to become a Back Tender. Tr. at 162, 231–32, 251, 260–61.

Harris's problems with the Brooks brothers were even more serious. Birchard and Kip Brooks were equally free with racially derogatory comments aimed at Harris, and complained about Harris's work performance in racial terms. Tr. at 187–89, 191–93, 292–93. Their racist views were also widely known. Tr. at 191, 271, 278. One nota-

---

**13.** The Court notes that there was some preliminary discussion during the course of trial as to whether the Court's consideration should be limited to those events which occurred prior to October 19, 1988. On that date, Defendant implemented "Project: Productivity" and established a uniform system of promotions based on mill seniority. Tr. at 893–95. *See* Defendant's Exhibits 6, 7, & 9.

The Court holds that the implementation of Project: Productivity is irrelevant to Plaintiffs' hostile environment racial harassment claims. A hostile workplace environment can violate the MHRA even if the consequences of the racial harassment do not include specific economic loss to the plaintiff. *See Rogers*, 454 F.2d at 238 (psychological disadvantage is a harm remediable by Title VII hostile environment claim). Thus, Plaintiffs need not show that the hostile environment caused them to lose promotions to

which they were entitled. That nexus may be relevant, however, to the question of whether Plaintiffs suffered discriminatory disparate treatment by Defendant in training and promotions.

**14.** This listing described the operation of a coated paper machine. The uncoated paper machines did not have a Coater Operator. Tr. at 970.

**15.** The Court finds that testimony from a variety of witnesses offered by Plaintiffs and Defendants supports the veracity of these exhibits. *See, e.g.,* Tr. at 960–66.

**16.** Defendant does not dispute this description of Plaintiffs' classifications after the implementation of Project: Productivity.

ble incident of public harassment involved the Brooks brothers donning white suits and white hats, ordinarily used while cleaning the paper machines but on this occasion clearly intended to recall the Ku Klux Klan, and "prancing" around Harris at his work station. Tr. at 332–33. *See* Defendant's Exhibit 28 (white suit worn by Brooks). This incident occurred in the presence of Foreman Parker, who considered it to be merely a joke. *Id.* On another occasion, Birchard and Kip Brooks threatened to fight with Harris and warned him to get the other black workers who had accompanied Harris from Mobile to Jay for the fight. Even after Harris notified Foreman Richard Parker of the problem, Birchard Brooks continued to threaten Harris. Tr. at 131–38, 1537, 1539–40 [17].

As a matter of course, Birchard Brooks ignored work directives from Harris, even though he was subordinate to Harris on the Number 2 machine, and he attempted to get others to join in his racist insubordination. Tr. at 265, 270–71, 272, 284, 292. This conduct was known to Foreman Parker, who spoke with Brooks at one point. Tr. at 271, 273, 285, 292.[18] But Birchard Brooks did not limit his racial attacks to Harris. White co-workers considered by Brooks to be too friendly with Harris were titled "nigger lovers," Tr. at 271, 285, 291, and were physically harassed. Tr. at 276–77.

Harris was also subjected to epithets from other workers and supervisors like "black nigger," "goddamn nigger," "black ass," "watermelon man," and "Buckwheat." Tr. at 114–15, 198, 293, 296, 1535.

These incidents were known, in most cases, to supervisors and foremen. Tr. at 252–53, 313–14, 315–16, 1535. "KKK" appeared on rolls of paper with which Harris worked, Tr. at 141–42,[19] on a steel support near Harris's work station, Tr. at 197, 287, and on a picture of a former employee posted in the mill who had himself engaged in racist name-calling. Tr. at 198, 241, 242–43, 1421. *See* Defendant's Exhibit 21.[20] While there may not have been a means by which a supervisor could have seen the graffiti on the paper rolls, the graffiti on the steel support and on the picture was large, enduring, and occurred in an area supervisors visited daily; thus, a supervisor could have and should have seen it. Tr. at 123, 287, 195, 1448–49, 1475. There was also racist graffiti, such as "nigger go back south," in the bathrooms used by workers and supervisors alike. Tr. at 378–79, 1449. Harris also felt that he was ignored by supervisors who would not even respond to Harris's normal and polite greetings in the morning. He classified his relationships with all the supervisors as "very negative." Tr. at 106–08.

Finally, a picture postcard from the "Our Gang" television series was posted next to the time clock with an added caption reading: "The new generation of papermakers." The postcard was posted within one week of Harris's arrival at the Jay Mill, Tr. at 123–24, and depicted the "Little Rascals" in confusion attempting to wash a dog. The character "Buckwheat" was set apart from the other, white children. Tr. at 246.[21] Harris testified that he perceived

---

**17.** Superintendent Brian Reed and Defendant's Equal Employment Opportunity Officer Glen Zalkin were also notified of this incident by Harris. Tr. at 136–39. *See also* Plaintiff's Exhibit 1.

**18.** Birchard Brooks's hatred of Harris and the consequent continuing problems on Number 2 machine were well-known to Defendant's management personnel, even after the commencement of this litigation, as a consequence of Harris's own complaints to supervisors and foremen and a public yelling match in the workplace between Brooks and Harris. Tr. at 1405–06, 1436–38.

**19.** Supervisors were notified of this incident by Harris. *Id.*

**20.** There was testimony that Harris did not himself remove this cartoon from the bulletin board, even though he had the opportunity. Tr. at 245. The Court notes that there is no affirmative duty on the part of an employee to act to remove unwelcome racial speech or conduct from the workplace. That burden rests squarely with the employer.

**21.** Superintendent Brian Reed testified that he had seen this postcard on several occasions. Tr. at 1467–68.

this postcard to be racially derogatory and directed at him. Tr. at 123, 246. When taken in tandem with the use of "Buckwheat" as a racist epithet in the mill, the Court finds that this postcard could be viewed by a reasonable black person to be an unwelcome racial statement.[22]

The Court finds that the quality and quantity of the racial speech and conduct described above and experienced by Plaintiff Harris rises to the level of racial harassment by creating an intimidating, hostile and offensive work environment so severe and pervasive that it substantially altered Harris's working conditions. The Court also finds that there is abundant evidence that Defendant's agents, supervisors, and foremen had actual knowledge of this racial harassment in most circumstances, and in the remaining instances would have had knowledge of the harassment being suffered by Harris had Defendant exercised reasonable care. The Court holds that Plaintiff Harris satisfied his burden of establishing a *prima facie* case of hostile environment racial harassment.

### B. Pugh and Racial Harassment

Plaintiff Eddie Pugh did not fare much better. One of Pugh's antagonists was Tim Gulliver, a Machine Tender on Number 3 paper machine. Pugh described one incident where he and the Back Tender had spent almost an entire shift searching for the source of holes in the paper being generated by their machine. Gulliver, unhappy with their progress, singled out Pugh, accused him of being a "Goddamn lazy ass," and called Pugh a "Goddamn nigger." Foreman J.R. O'Neal was notified of this incident, but offered Gulliver only a mild rebuke and no formal discipline after speaking with Gulliver and Pugh. Tr. at 469–471, 477, 1487–88, 1490–91.[23] On another occasion, Gulliver donned a cone paper hat, which Pugh understood to be a Ku Klux Klan hat, and attempted to push Pugh toward the repulping machine. Tr. at 474, 503–05, 509.[24]

Pugh also suffered racial epithets from a variety of sources. He was called "porch monkey," Tr. at 501–02, "nigger," "dumb nigger," Tr. at 493, 502, "watermelon," and "barbecue." Tr. at 415. Even Foreman O'Neal referred to Pugh as a "nigger" and opined that "the nigger belongs back down south." Tr. at 503, 510. Ricky Tibbetts, one of Pugh's co-workers, wrote "hee ho" (apparently meaning "heave ho") next to Pugh's name on a list of workers posted in plain view near Number 3 machine. Tr. at 471, 486–87. Racial graffiti, including "Buckwheat," "black sucks," and "KKK," appeared in the bathrooms, Tr. at 487–88, 1358–59, 1516, and "black sucks" was scrawled on the coater where Pugh worked. Tr. at 473.

Plaintiff Pugh was also made to endure a persistent stream of racist statements from a variety of sources, including supervisors and foremen,[25] and racist comments about the stereotyped food preferences of black

---

**22.** There was testimony that the person who posted the postcard on the bulletin board did not intend a racial slight, Tr. at 1326–1331; however, as the Court has already noted, the intent of the speaker is not relevant to the question of the unwelcomeness of the speech.

**23.** Glen Zalkin testified that O'Neal's response "was an appropriate one and I would not have counselled him to do anything otherwise." Tr. at 1552. *See infra* note 32.

**24.** The Court notes that Gulliver testified that he never called Pugh a "nigger" and intended the hat to look like a party hat. Tr. at 1495–1498. The Court gives little credence to this testimony, or to the testimony that Gulliver and Pugh were social friends outside the mill. *Id.*

**25.** The following is a sampling of the offensive racist comments, characterized by some witnesses as "jokes," to which Pugh was exposed:

"What's the hardest thing on a black man? The third grade." Tr. at 492.
"What did God say when he made the first black man? Oh, I burned one." Tr. at 542.
"How do you find a black person? You have to see if they smile." Tr. at 1513 (known to Foreman Carl Anderson).
"Why do black people keep their children inside? They don't want the cat to bury the kids in the yard because they are the color of shit." Tr. at 1316.
There is evidence that some racist "jokes" were told in the presence of Wade Welborn, a Human Resources representative for Defendant, and no action was taken. Tr. at 415, 512.

people.[26] Ricky Pugh, Plaintiff Pugh's younger brother and a replacement worker at the mill, sought Pugh's help when a co-worker named Mike Williams wrote "nigger," "Buckwheat," and "Buckwheat go home" on the paper rolls for a period of a week. Tr. at 472–73, 1313, 1357.[27] And like the white workers who associated with Plaintiff Harris, white workers who befriended Pugh were entitled "nigger lovers." Tr. at 506.

The Court finds that the above described racial speech and conduct to which Plaintiff Pugh was exposed created a hostile and offensive workplace environment sufficiently pervasive and severe to alter Plaintiff Pugh's working conditions. The Court further finds that Defendant's agents, supervisors and foremen had direct knowledge of many of these incidents, in some cases as a consequence of their personal involvement in racist speech or conduct, and in the remaining instances should have known as a consequence of the exercise of reasonable care that a hostile environment had developed around Plaintiff Pugh. The Court holds that Plaintiff Pugh has satisfied his burden of establishing a *prima facie* case of hostile environment racial harassment.

### C. Minor and Racial Harassment

Plaintiff Minor had two principal racist harassers: Tim Bachelder[28] and Jackie Hudson. Bachelder's racist attitudes were well known, partly because he screamed "nigger" at Minor across the room more than once. Tr. at 1356. In one incident, Bachelder picked up a sledge hammer and grabbed Minor around the collar while yelling "you fucking nigger." Minor reported the incident to Supervisor Greg Houdek, who told both Bachelder and Minor that he wanted them to work together and sent them back to their machine. Tr. at 599–601, 1069–71.[29] In another incident, Bachelder grabbed Minor, again yelling "you fucking nigger, you fucking nigger," and pushed Minor on the catwalk between the calendar stack and pulper. Minor testified that he feared falling into the steel blades of the pulper or the dual steel pressing rolls of the calendar stack, and so pushed past Bachelder to escape. Foreman Dennis Coombs witnessed this incident. Tr. at 601–03.

Both of these incidents were later included on a disciplinary report by Houdek against Bachelder,[30] but only the first incident was reported to include racist language. Plaintiff's Exhibit 11; Tr. at 605, 657–58, 1078–79. In addition, Minor was disciplined after the latter incident for "pushing and shoving over work responsibilities," Defendant's Exhibit 19, Tr. at 606–08, even though Houdek conceded that Bachelder started the altercation and Minor had little recourse under the circumstances. Tr. at 1075–76.

Jackie Hudson, Back Tender on Number 4 paper machine, preferred sabotaging Minor's work, telling Minor that he was "going to make your day hard for you," Tr. at

---

**26.** For example:

> Eddie was passing by with some food one day on his way to the microwave and another man on the machine motioned and looked over at Eddie and said, "them niggers like fried chicken and watermelon, you ought to see them down south."

Tr. at 493. *See also* Tr. at 525, 542, 1357 (references to watermelon, the latter known to Superintendent Greg Houdek).

**27.** Ricky Pugh also described instances where co-workers passed around a picture of a jungle and "a group of black people with no clothes and you could see flies and stuff around," and told Pugh that "'this is your family.'" Tr. at 1317–18. Ricky Pugh also was made to endure references to slavery. Tr. at 1316–17.

**28.** Bachelder was fired by Defendant, but not because of his racist conduct. He apparently had engaged in drug use and was the subject of a number of disciplinary reports. Plaintiff's Exhibit 11, Tr. at 659.

**29.** Greg Houdek's testimony was that Defendant's investigation of the incident disclosed that Bachelder had a sledge hammer in his hand at the time of his attack on Minor, but that "based on our findings we did not feel there was malicious intent on Tim's part." Tr. at 1071. The Court finds this determination incredible based on the available evidence and gives little credence to this testimony or the conclusion drawn by Defendant's internal investigation of this incident.

**30.** The initial incident was not noted in a written warning by Greg Houdek until after the second incident. Tr. at 1073–74.

626, and other verbal abuse to Bachelder's physical attacks. Hudson regularly made derogatory comments about black people, Tr. 627, 629–30, 656–57, 671–72, 1356, and joined the refrain of those calling Plaintiffs' friends "nigger lovers." Tr. at 682. Hudson also assigned Minor extra work and especially unpleasant work. Tr. at 627–28. Minor had informed Forepeople Mary Wilson, Greg Houdek, and Dennis Coombs that Hudson had engaged in racial harassment, Tr. at 625, thus putting Defendant on notice of Hudson's propensities.

After one day of prolonged abuse of Minor, Hudson wrote "Willie slab" repeatedly on the roll of paper coming off the machine, indicating that Minor should engage in the difficult physical effort of removing large amounts of "slabbed" paper from the paper roll. The result of slabbing this huge amount of paper was a shutdown of the paper machine for about seventy minutes. Hudson admitted to the foreman that the slabbing of good paper had been a practical joke he was playing on Minor. But even after Minor informed Foreman Carl Anderson that Hudson regularly engaged in racial harassment, Anderson's only concern was with the machine being shut down and the waste of good paper. Anderson required Hudson *and Minor* to clean up the extra paper. Hudson received a written warning from Superintendent Laverdiere which did not mention any potential racial content to the incident. Tr. at 608–622, 671, 1509–12; Plaintiff's Exhibit 12. Jackie Hudson was later transferred to another crew. Tr. at 1553.

Other members of the crew took their lead from Hudson. On one occasion, when a co-worker was asked by Hudson to clean up a pile of waste paper, she responded, "I'm not your nigger like Willie." Tr. at 628. Minor was also subjected to racially derogatory comments from other workers and supervisors, Tr. at 1353–54, 1369–70,

1371–73, and once was given a mock express ticket to Africa containing a derogatory characterization of a spear-carrying black man by a co-worker. Tr. at 1369–71.

The Court finds that this pattern of conduct and speech constituted racial harassment sufficiently severe and pervasive to create a hostile and offensive workplace and to substantially alter Plaintiff Minor's working conditions. The Court specially finds that either the Bachelder incidents or Hudson's continuing behavior were sufficient, standing alone, to constitute racial harassment violative of the MHRA. The Court also finds that there is substantial evidence that Defendant's agents, supervisors, and forepeople had actual notice of this racial harassment in virtually every relevant circumstance. The Court holds, therefore, that Plaintiff Minor has established a *prima facie* case of hostile environment racial harassment.

### D. International Paper's Response to Racial Harassment

Defendant's response to the pervasive atmosphere of racial harassment and intimidation surrounding Plaintiffs was woefully inadequate and, at times, nonexistent. As already discussed with respect to individual incidents, Defendant never undertook to punish the perpetrators of this harassment with anything more severe than verbal remonstrances and written warnings.[31] In several circumstances, Defendant's supervisors, superintendents, personnel staff, and foremen engaged in what they described as "investigations" of particular incidents which consisted of speaking with the perpetrator and the victim. In the face of the inevitably conflicting stories which emerged from these brief interviews, Defendant's agents found no harassment and no cause for more serious discipline other than reminding both parties of Defendant's antidiscrimination policy.[32] There were

---

**31.** The Court finds insufficient evidence in the record to permit a finding that the firing of Tim Bachelder or the transfer of Jackie Hudson were in any way related to their racist activities.

**32.** The Court, during the bench trial segment of this case, engaged in the following colloquy

with Glen Zalkin, Defendant's Equal Employment Opportunity Officer, regarding Defendant's method of investigating claims of harassment:

THE COURT: Let me ask you this. Let's assume that you are notified in your office on a given day that there has been a serious racial

many more circumstances where no investigation was launched and no action taken. The Court holds that these responses were insufficient given the severity and pervasiveness of the offensive conduct and speech in Defendant's mill, and the fact that Defendant's agents were fully informed, in most circumstances, of the existence of the offending conduct and speech.

The Court finds that Defendant's supervisors participated in an education program on antidiscrimination law and practice entitled "Boomerang Training," although the record does not reflect when the training took place. Tr. at 1386, 1395–96, 1409–10, 1425, 1450, 1465, 1489, 1504. *See also* Defendant's Exhibit 11 ("Boomerang" manual). The Court also finds that Defendant circulated an equal opportunity/antidiscrimination policy form dated January 1, 1990 to be signed by each worker in the Jay mill, but the Court further finds that this policy form is silent on the question of racial harassment. *See* Defendant's Exhibits 34, 35, 36; Tr. at 1450–51. There is insufficient evidence in the record, as well, to support a finding that Defendant's training and broad policy statements were in any way effectively implemented when the time came to redress the harassment suffered by Plaintiffs.[33] The Court holds that these purported blanket remedies are insufficient to shield Defendant from liability for the hostile environment racial harassment that occurred.

In sum, Defendant's policies, training, "investigations," and tepid warnings fall far short of the "immediate and appropriate corrective action" required by the MHRA. Accordingly, the Court hereby *FINDS* in favor of Plaintiffs Harris, Pugh, and Minor and against Defendant International Paper on the question of liability for hostile environment racial harassment under the MHRA.

## III. FINDINGS OF FACT ON DISPARATE TREATMENT

■ The special verdicts issued by the jury at the end of the trial in this case play

---

incident on the floor. And I take it you would go immediately to the floor and the probability is you would conduct an examination?
ZALKIN: That's correct.
THE COURT: Of the workers and find out what happened; is that correct?
ZALKIN: That's correct.
THE COURT: Now, let's say there are only two people down there that know what happened ... Okay? You talk to one and he tells you there has been seriously demeaning racially discriminatory language used by someone else to him on the floor. Okay? You then go to the other person and you ask that person: Did this event happen, was that language used, and the person says no, absolutely not, it never happened. Okay? Now, do you have authority to resolve questions of fact and to determine the credibility of the participants in the incident in the first instance?
ZALKIN: Yes, I do.
THE COURT: Do you ever exercise that authority?
ZALKIN: I have exercised that authority in disciplinary actions in the mill; yes, when either— but not on the first occasion.
THE COURT: You don't do it on the first occasion?
ZALKIN: Unless I have reason to believe that one or the other is lying, I've got to give the guy due process.
THE COURT: Due process does not necessarily mean you are immobilized from making a decision, it means you hear everybody fairly. If you never act on the first instance, that means that everybody gets a first bite at racial discrimination in the workplace free, by simply denying, controverting the allegation. Is that what is going on here?
ZALKIN: In all of the incidents that I investigated, your Honor, I never came to the conclusion that one side, I believed one side over the other. I tried to listen to both sides fairly and if I had felt that any of these incidents, this guy is just lying but he did it, he's just covering up, I would have taken action. I didn't believe it in any of these cases....
Tr. at 1556–58.

**33.** If the Boomerang training occurred before the incidents of which Plaintiffs are complaining, the Court sees little evidence that the training had an effect on the supervisors at Defendant's Jay mill. Supervisor Richard Parker testified that he was not aware at the time of these incidents that the use of the term "nigger" was considered offensive by black people. Tr. at 314.

There is some evidence which suggests, however, that Defendant's blanket responses were instituted *after* the commencement of this lawsuit. The Court finds that it is impossible to distinguish between the effectiveness, if any, of these purported curatives and the natural effects on an employer's behavior of the commencement of an employment discrimination lawsuit against that employer. Defendant has failed to offer sufficient evidence to permit such a fine distinction.

a substantial part in determining the outcome of Plaintiffs' claims of disparate treatment in training and promotions.[34] The jury found that Defendant entered into and breached contracts "to provide [each Plaintiff] with training necessary to qualify [each Plaintiff] for promotion to higher positions on [Defendant's] paper machines." Jury Verdict Forms (Docket Nos. 32, 33, & 34). The jury also found that Defendant's breach caused Plaintiffs to suffer measurable economic damages. Two inferences must be drawn from these special verdicts: (1) the jury concluded that but for the absence of the training illegally withheld from Plaintiffs by Defendant, Plaintiffs were qualified to be promoted, and (2) the jury concluded that Plaintiffs would have been promoted had they received the training to which they were entitled.[35]

The jury's verdicts are, therefore, conclusive for Plaintiffs' *prima facie* case and Defendant's sole articulated defense. Plaintiffs bore the initial burden of establishing that they were qualified for pro-

motion, and were rejected for promotion in spite of their qualifications.[36] Defendant attacked Plaintiffs' *prima facie* cases, and attempted to rebut any inference of discrimination, by arguing that Plaintiffs were less qualified than the workers who were promoted. The jury's special verdicts require a finding that Plaintiffs were qualified for promotions, and were rejected for promotion and the training necessary for promotion despite their qualifications. In sum, the jury's verdicts lead inexorably to the conclusion that Plaintiffs established their *prima facie* cases and are entitled to the legally mandatory presumption that Defendant engaged in disparate treatment on the basis of race. Further, Defendant's rebuttal argument—that Plaintiffs were not qualified—was necessarily rejected by the jury in its implicit finding by a preponderance of the evidence that Plaintiffs were qualified.[37]

This analysis does not, however, finally resolve Plaintiffs' claims of disparate treat-

---

**34.** As already noted, the parties agree that the Court is bound by the jury's findings of facts on issues common to the breach of contract claim and the MHRA claim. *See supra* note 3.

**35.** *See infra* Part IV (section of the Court's instruction to the jury on the damages issue which makes clear that an award of damages is necessarily linked to a determination that Plaintiffs would have been promoted).

**36.** Two branches of the requisite *prima facie* case are not in issue: (1) Plaintiffs are all members of a protected group, and (2) Defendant continued to seek applicants for the positions to which Plaintiffs should have been promoted after Plaintiffs were rejected.

**37.** The Court finds that there is overwhelming evidence in the record supporting the conclusion that Plaintiffs established their *prima facie* cases, *see* Tr. at 871 (the Court finds in response to a directed verdict motion that Plaintiffs established their *prima facie* cases), and that Defendant's rebuttal argument was not supported by sufficient evidence to warrant a finding other than that Plaintiffs were qualified for promotion. The Court bases its findings on the undisputed facts that the Plaintiffs are all black, none of the Plaintiffs were promoted, the jury found that Plaintiffs were not given sufficient training, and on the following evidence:

(1) Plaintiff Harris was qualified. Tr. at 31–46, 52–65, 66–69, 90–92, 162–64, 179, 185, 189,

228–29, 236–37, 257–59, 269–70, 282–83, 285, 295, 310–11, 355–56, 373–74, 387–88, 992–99, 1002, 1016–23, 1024–25, 1033–36, 1417–18, and Plaintiffs' Exhibits 8 and 9.

(2) The job to which Plaintiff Harris would have been promoted was filled by others of similar or lesser qualifications. Tr. at 69, 71–73, 78–82, 89–92, 95–103, 105–06, 164–67, 175–76, 178–79, 182–83, 218–20, 228–30, 234, 301–03, 305–06, 323–24, 341–42, 355–56, 358–59, 362–66, 378, 906–11, 969, 1000–01, 1025–29; Plaintiffs' Exhibits 16, 15E, and 16A; and Defendant's Exhibit 30.

(3) Plaintiff Pugh was qualified. Tr. at 399–403, 408, 416, 420–24, 426, 428, 433, 436–37, 443–44, 446–47, 454, 458–65, 486, 536–37, 921, 924, 1086–91, 1094–97, 1106–08; Plaintiffs' Exhibits 3, 6 and 7; and Defendant's Exhibits 3 and 31.

(4) The job to which Plaintiff Pugh would have been promoted was filled by others of similar or lesser qualifications. Tr. at 417–19, 427–31, 433–36, 438–41, 444, 447–50, 452, 463, 489–91, 906–11, 1119–20.

(5) Plaintiff Minor was qualified. Tr. at 527, 539–540, 561–65, 567, 572–76, 587–93, 595, 606–08, 648, 660, 667–70, 1043–47, 1050–53, 1352–53, and Defendant's Exhibits 32 and 33.

(6) The jobs to which Plaintiff Minor would have been promoted, and from which Plaintiff Minor was demoted, were filled by others of similar or lesser qualifications. Tr. at 536–37, 565, 568, 576–86, 590, 592, 594–98, 641–47, 906–11, 1052–53, and Defendant's Exhibits 19, 32, and 33.

ment. While the jury necessarily concluded that Plaintiffs were qualified, the Court finds that Defendant adduced sufficient evidence that Plaintiffs were not qualified to satisfy its burden of production. The presumption of discrimination must, therefore, be dropped from the case, leaving Plaintiffs to satisfy the ultimate burden of persuasion on the question of whether or not Defendant engaged in disparate treatment. The jury's findings that Plaintiffs were qualified do not necessarily lead, in the absence of the presumption of discrimination, to the conclusion that Defendant engaged in race-based disparate treatment. The jury's verdicts do, however, support the conclusion that Defendant's only articulated nondiscriminatory reason for failing to promote Plaintiffs was a mere pretext, and thus they constitute strong indirect evidence of discrimination. *See Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095; *McDonnell Douglas,* 411 U.S. at 804–05, 93 S.Ct. at 1825–26.

But Plaintiffs need not rely exclusively on the jury's verdicts for their success. There is substantial additional evidence, both direct and indirect, that racial animus motivated Defendant's failure to train and promote Plaintiffs. Defendant did not have an organized, uniform system for determining which employees would be trained or promoted during the period beginning with Plaintiffs' hirings and ending with the implementation of Project: Productivity on October 19, 1987.[38] Instead, training and promotion decisions were substantially influenced by favoritism, particularly between the supervisors on loan from Defendant's southern paper mills and white southern replacement workers,[39] and a variety of subjective factors wholly unrelated to employees' merit. For example, Plaintiffs' ability to "get along" with co-workers and "work in a team atmosphere" was taken into account. Decisions on whether Plaintiffs would be trained and promoted were directly influenced by co-workers and loaned supervisors.[40] Given the severe and pervasive atmosphere of racism in the Jay mill, the numerous incidents of harassment involving Plaintiffs and their co-workers, the testimony of several witnesses that favoritism was shown toward white employees, and the direct involvement in training and promotions decisions of people who personally engaged in racist speech or conduct, the Court finds substantial evidence supporting the conclusion that Defendant's decisions neither to train nor promote Plaintiffs were susceptible to racial bias and were, in fact, corrupted by racial bias. Tr. at 69–90, 157–60, 260, 358–70, 455–58, 483–85, 488–491, 528–30, 581–86, 662–67, 903–04, 907–09, 934–38, 939–40, 955, 1009–14, 1023, 1046–48, 1050–51, 1053, 1066–68, 1092, 1112–19, 1349–52, 1387–881 1392–93, 1396–97, 1410–11, 1567–69; Plaintiffs' Exhibit 2 (there were no labor agreements controlling promotions during this period).

Consistent with the jury's rejection of Defendant's argument that Plaintiffs were not qualified for promotion, the Court finds that Defendant has failed to advance any valid, nondiscriminatory reason for failing to train and promote Plaintiffs. As a result, the Court finds that Plaintiffs have satisfied their ultimate burden of persuasion of establishing by a preponderance of the evidence that race was a substantial

---

**38.** The Court finds that Project: Productivity established a facially neutral system which based promotions on "mill seniority." *See* Plaintiffs' Exhibit 18. However, the Court also finds that a significant number of promotions, including several which were part and parcel of Defendant's disparate treatment of Plaintiffs, were made on the eve of the implementation of Project: Productivity. As a result, Project: Productivity served to institutionalize and perpetuate the disparate treatment of Plaintiffs.

**39.** The Court finds that loaned supervisors who were participating in training employees directly influenced training and promotion decisions.

**40.** In addition, there is some doubt that the supervisors who made the actual promotion decisions had sufficient knowledge of Plaintiffs' working skills to make a merit-based judgment. *See, e.g.,* Tr. at 1033–34 (Robert Allen speculating on whether he had contact with Harris). This doubt that Defendant made merit-based decisions supports an inference that decisions were based on the illicit biases of co-workers and loan supervisors.

motivating factor in Defendant's decision not to train and promote Plaintiffs.[41] Accordingly, the Court hereby FINDS in favor of Plaintiffs and against Defendant International Paper on the question of liability for disparate treatment employment discrimination under the MHRA.

## IV. REMEDIES

The MHRA gives the Court broad authority to grant "an appropriate remedy" for unlawful employment discrimination which may include, but need not be limited to, (1) an order to cease and desist unlawful practices, (2) an order to reinstate or employ a victim with or without back pay, and (3) civil penalties of specified amounts. 5 M.R.S.A. § 4613(2)(B). Plaintiffs' Complaint demands the following remedies for Defendant's violation of the MHRA: (1) an order placing Plaintiffs in the positions to which they would have been promoted but for Defendant's unlawful discrimination and any necessary training for those positions, (2) back pay and compensation for lost fringe benefits, (3) the statutory civil penalties, (4) $25,000 for each Plaintiff for damages resulting from racial harassment, and (5) an injunction prohibiting Defendant "from discriminating against [Plaintiffs] on account of their race...." Complaint at 3–4 (Docket No. 1a). Civil penalties are not available in this case because Plaintiffs failed to file a complaint with the MHRC before bringing suit in this Court. 5 M.R.S.A. § 4622. In addition, compensatory damages for pain and suffering, and punitive damages, are not available under the MHRA. *Greene*, 623 F.Supp. at 298–99. *See also Cumpiano*, 902 F.2d at 159 (Title VII does not permit punitive or compensatory damages). The Court may award only "make whole" relief which directly remedies the effects of Defendant's discriminatory acts and insures that Defendant's discrimination against Plaintiffs will not recur. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975). This leaves only Plaintiffs' demands for an order requiring promotions, back pay, and compensation for lost fringe benefits, as well as any equitable relief which may be

---

**41.** This conclusion is not affected by the conflicting statistical evidence introduced by Plaintiffs and Defendant. Statistics showing a defendant's "general policy practice with respect to minority employment" may help establish that the allegedly nondiscriminatory reasons advanced by defendant are pretextual. *McDonnell Douglas*, 411 U.S. at 804–05, 93 S.Ct. at 1825. In a disparate treatment case, however, "statistical comparisons, although often relevant, are obviously less crucial" than they would be in a disparate impact case. *Cumpiano v. Banco Santander Puerto Rico*, 902 F.2d 148, 157 (1st Cir. 1990).

The Court finds that the statistical evidence lends limited support to the conclusion that Defendant engaged in racially discriminatory disparate treatment of Plaintiffs. Plaintiffs' expert testified that with respect to the permanent replacement workers hired from Defendant's Mobile mill, including Plaintiffs, all of the white workers were promoted on or before October 19, 1987 while only one of the black workers was promoted. Tr. at 765–69; Plaintiffs' Exhibit 17. Plaintiffs' expert also found a statistically significant difference between promotions of blacks and promotions of whites when using a contingency table analysis to consider the promotion rate among all permanent replacement workers who survived the October 19, 1987 reorganization. Tr. at 770–75; Plaintiffs' Exhibit 30.

Defendant's expert employed a "multiple pools" analysis which assumed a strong presumption in Defendant's mill that promotions on a particular machine would take place from within the pool of employees working on that machine. Tr. at 1168–1202. This assumption is not adequately supported by evidence in the record, and there is some unrebutted evidence that crossovers were possible both between Number 1 and Number 2 paper machines and between Number 4 and Number 5 paper machines. Even granting the validity of this assumption, Defendant's expert offered only the following conclusion:

> this is not evidence, it can not [sic] be presumed to be evidence of discrimination because [the results] could have happened so easily by chance, which is not to say there wasn't [discrimination]. It's just that this is not evidence for it....

Tr. at 1186. *See also* Tr. at 1197 ("No statistical evidence that plaintiffs can look at that would support their claim"). Thus, at best, Defendant's expert testified to the absence of statistical support for Plaintiffs, rather than the presence of support for Defendant's position.

The Court need not reach the issue reserved at trial as to the admissibility of certain rebuttal evidence by Plaintiff's expert. Tr. at 1250.

necessary to prohibit future racial harassment.

The Court is bound by the jury's verdicts when awarding remedies just as it was bound by the jury's findings when assessing liability. The jury was instructed in the method by which it should award damages as follows:

Where you find that the defendant breached a contract with the plaintiff, if you do find that, you may award as damages the difference between the pay which the plaintiffs should have received in the past, and the pay that they've actually received in the past.

You may also award as damages the difference between the pay they should receive for a reasonable period of time in the future, and the pay they will actually receive during that same period, as you shall determine from the facts the reasonable duration of that period to be....

Now, in this case the only claim for damages is for money damages and it is for the difference in pay that these plaintiffs would have received, if they had received the training which they say they were promised, and the pay they had in fact received because, they claim, that the contract was not performed.

It will be for you to determine from the evidence when the breach occurred. And then in order to determine if there are damages, you must determine whether the failure to perform the contract, that is, the failure to provide them with the training, legally caused them not to be promoted at some time thereafter. If you find that it did, then you will know at what point in time that they were not promoted. And you can then determine, from that time forward, what they would have been had they been promoted, and you will have in the evidence, the evidence as to what they have in fact been paid not having been promoted, and the damages will be the difference.

Tr. at 1290–91. Based on these instructions, the jury awarded each Plaintiff $55,000 in front pay beginning from the date Defendant failed to promote each Plaintiff for some unknown period of reasonable duration into the future. Jury Verdict Forms (Docket Nos. 33, 34, & 35).

Thus, the jury compensated Plaintiffs for all monetary loss they suffered and will suffer for a reasonably foreseeable future period of time as a consequence of Defendant's breach of contract.[42] As the Court has previously explained, the only means by which the jury could have arrived at the conclusion that Plaintiffs suffered economic damages due to Defendant's failure to train was an implied finding that this failure to train proximately caused Defendant's failure to promote Plaintiffs to higher paying jobs. In sum, the jury's award compensates Plaintiffs for the income they lost as a result of Defendant's failure to promote Plaintiffs to higher paying jobs.

Plaintiffs' MHRA claims are based on their well supported contention that Defendant failed to promote them because of their race. The ordinary "make whole" remedy for such a wrong would be an award of back pay and an order directing Defendant to grant Plaintiffs the promotions to which they are entitled. However, the jury has already granted the equivalent of a back pay award to Plaintiffs. In addition, the jury has already granted compensation to Plaintiffs for their continuing inability into the foreseeable future to obtain the promotions to which they are entitled. As a result, any further award of money damages by the Court, and any order requiring Defendant to promote Plaintiffs, would be nothing less than a duplication of the jury's award of full economic relief. The Court exercises its inherent discretion in these circumstances to award only "make whole" relief and refrains from awarding duplicative reme-

---

**42.** The jury was not allowed to and did not award any money damages for the effect on Plaintiffs of the hostile environment caused by racially based harassment by co-workers and supervisors or the hurt, embarrassment, and humiliation caused by the harassment. Thus, these elements of damages to Plaintiffs were not addressed by the jury's award of damages for breach of the contract to train for promotion.

dies to Plaintiffs.[43]

Plaintiffs ask the Court to interpret the jury's award of damages as extending only two years into the future. The Court finds no basis for making this arbitrary delineation of what constitutes a "reasonable duration" into the future. The Court must take the jury's verdict, as rendered pursuant to instructions accepted by both parties, at face value. The Court refuses to engage in speculation as to what the jury may or may not have thought or believed when they awarded these damages. Accordingly, there are no additional monetary damages for breach of the employment contract available to Plaintiffs by reason of Defendant's violation of the MHRA.

The jury's award of damages did not, however, provide any remedy for Plaintiffs' hostile environment racial harassment claims. "Make whole" relief is not limited to economic damages: "Where racial discrimination is concerned, 'the [district] court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.'" *Albemarle*, 422 U.S. at 418, 95 S.Ct. at 2372 (quoting *Louisiana v. United States*, 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965)). Defendant's complete inability or unwillingness to remedy the hostile racial environment it has allowed to exist in its Jay mill requires this Court to give affirmative and specific relief which will guarantee that the circumstances which victimized these Plaintiffs will never arise again.[44]

Defendant must accomplish, at a minimum, three tasks: (1) making abundantly clear to all employees what conduct is appropriate to a workplace and what conduct is inappropriate; (2) assuring black employees that their complaints of harassment will be taken seriously by Defendant, and that Defendant will remedy any and all harassment; and (3) communicating without equivocation to all employees that any violation of policies prohibiting harassment will be punished fairly but sternly.

## V. INJUNCTION AND ORDER

The Court hereby ORDERS that Defendant and all its servants, officers, directors, and employees CEASE AND DESIST from continuing or maintaining, or permitting to be continued or maintained, any policy, practice, custom, or activity which perpetuates, condones, permits, creates, or allows racial harassment in the workplace including, but not limited to, any and all offensive conduct and speech implicating considerations of race.

The Court further *ORDERS* that Defendant initiate *immediately* the following programs:

(1) The immediate provision of adequate training and education to all employees, both supervisory and nonsupervisory, in questions of race relations generally and in the workplace, racial harassment, and employees' and employers' rights and responsibilities under state and federal antidiscrimination law. Specifically, all employees are to be informed in clear and easily understood language of their right to a work environment free of harassment inspired or motivated in any way by considerations of race. Further, all employees are to be informed that the conduct of co-workers, as well as that of supervisors, can be sufficient to create a work environment which violates state and federal antidiscrimination law. Such

---

**43.** Defendant argues that granting promotions to Plaintiffs now would violate the rights guaranteed to returning strikers by the National Labor Relations Act. Other than noting the peculiar irony of Defendant attempting to advance an argument on behalf of workers who engaged in a strike against it, the Court offers no opinion on this issue since the question of promotions has been disposed of on other grounds.

**44.** Injunctive relief is generally appropriate in racial discrimination cases except when there is no reasonable expectation that the discrimination will continue or recur, *United States v. W.T. Grant Co.*, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953), or when the effects of the discrimination have been eradicated by some event or action by the defendant. *County of Los Angeles v. Davis*, 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979). The Court finds that neither of these circumstances exists in this case; therefore, affirmative injunctive relief is appropriate.

training and education shall be provided on an ongoing and continuing basis pending further order of this Court and shall be repeated for all employees on a periodic basis of not less than once every six months.

(2) The immediate provisions of adequate training and education to all supervisory employees, including but not limited to management personnel, superintendents, forepeople, supervisors, and operators, in the proper methods for investigating and remedying racial harassment in the workplace. Specifically, all supervisory employees are to be informed orally and in writing of their obligation under the law to immediately and adequately remedy any racial harassment which exists in the workplace. This program shall include teaching supervisory employees methods for examining the workplace and searching for evidence of racial tensions, such as racial graffiti. Such training and education shall be provided on an ongoing and continuing basis pending further order of this Court and shall be repeated for all supervisory employees on a periodic basis of not less than once every three months.

(3) A regular system by which Defendant's senior supervisory and management personnel shall examine the workplace on a periodic basis of not less than once each month and search for any evidence of racial tensions in the workplace including, but not limited to, any racial graffiti.

(4) An effective and formalized system for the prompt investigation and effective remedying of all allegations of harassment. This system must afford due process to the accused alleged perpetrator while guaranteeing redress, confidentiality, and protection to the victim. This system shall be publicized through the above-described training and education programs, separate printed materials to be distributed to all of Defendant's employees, and in the employee handbook (if any), in addition to being posted prominently throughout Defendant's facility.

This system shall permit victims an opportunity to choose confidential advisors who will participate in the complaint process and assist the victims in that process. Such confidential advisors may be attorneys, supervisors, co-workers, union representatives, or any other persons selected by the victims.

This system shall include an absolute and effective guarantee that no employee will suffer any disadvantage of any kind from Defendant or any of its agents, supervisors, or employees as a consequence of making an allegation of harassment or participating in this system in any way.

This system shall include the maintenance of all complaints, allegations, records, reports, evidence, interview notes, transcripts, and other materials created by Defendant and its agents and/or submitted to Defendant by a victim or his/her representative, in individual files. Such files shall be maintained separately from Defendant's regular personnel files by a specified Equal Employment Opportunity Officer.[45]

(4) The publication of all regulations on workplace harassment promulgated by the Maine Human Rights Commission and the federal Equal Employment Opportunity Commission, along with adequate and easily understood explanations of employees' and employers' rights and responsibilities under state and federal antidiscrimination law. Such publication shall occur in separate materials to be distributed to each employee and in the employee handbook (if any). These materials shall also be posted prominently throughout Defendant's facility.

(5) The immediate implementation of any and all other programs, practices, poli-

---

**45.** The Court does not mean to imply that exhaustion of any internal grievance procedure will be a prerequisite hereafter to the vindication of victims' statutory rights in a judicial forum. Title VII, and the MHRA by implication, do not impose such an exhaustion requirement, even when an arbitration clause is included in a personal contract or collective bargaining agreement. *Utley v. Goldman Sachs & Co.,* 883 F.2d 184, 186–87 (1st Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 842, 107 L.Ed.2d 836 (1990).

cies, and activities necessary to remedy the hostile racial environment which exists in Defendant's mill and to insure that Defendant's mill will be free of racial harassment in the future.

A failure by Defendant to implement *immediately* the above ordered programs, and all necessary and associated programs, practices, policies, and activities,[46] may subject Defendant to a finding of *civil contempt* and all penalties associated therewith upon proper motion by Plaintiffs. Upon a finding of any violation of this Order, Defendant will be liable for any and all attorney's fees and costs incurred by the moving party.

The Court hereby GRANTS leave to Defendant and Plaintiffs to file with the Court, on or before April 12, 1991, any proposed changes to this Order in a memorandum not to exceed ten (10) pages. Any proposals must specify the changes which are being sought and must include explicit rationales which would persuade the Court to amend this Order. In addition, the Court will entertain the filing of an *amicus curiae* brief within the same time period by any and all duly certified bargaining representatives of employees at Defendant's mill at Jay, Maine.[47] The filing of a memorandum by any party does not in any manner alter Defendant's obligation to comply *immediately* with the Court's Order.

The Court RETAINS jurisdiction of the cause and of the parties herein for enforcement of the Court's Order herein.

So ORDERED.

---

**46.** The Court now expressly states what should be apparent from this accompanying text. Adherence merely to the form of the requirements of this Order is not and will not be an adequate defense to allegations that Defendant has violated this Order. Defendant is obligated under this Order, simply and unequivocally, to eradicate racial harassment from its workplace. The specific programs mandated by this Order are minimum, but not necessarily sufficient, components of that task.

**47.** The record does not include a copy of any full and complete collective bargaining agreement between Defendant and any trade union. Without deciding an issue which is not properly before it, the Court notes that collective bargaining agreements which are inconsistent with public policies, including valid judicial orders, are not enforceable. *W.R. Grace & Co. v. United Rubber Workers,* 461 U.S. 757, 766-67, 103 S.Ct. 2177, 2183-84, 76 L.Ed.2d 298 (1983). The Court invites the participation of any involved trade unions in an effort to obtain any additional information which would be helpful in the final crafting of the Court's Order.