Steffan T. DUPLESSIS, Plaintiff,

v.

**TRAINING & DEVELOPMENT CORPORATION, et al.,
Defendants.**

Civ. No. 92–0096–B.

United States District Court,
D. Maine.

Aug. 24, 1993.

Lewellyn R. Michaud, Law Offices of Lewellyn R. Michaud, Bangor, ME, Margaret C. Lepage, Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, ME, for plaintiff.

Bernard J. Kubetz, Eaton, Peabody, Bradford & Veague, Bangor, ME, for defendants TDC, Penobscot Job Corps, Madden, Ray, Ettinger, Beckman and Conroe.

George C. Schelling, Gross, Minsky, Mogul & Singal, P.A., Bangor, ME, for defendants.

## ORDER AND MEMORANDUM
## OF OPINION

BRODY, District Judge.

This matter is before the Court for decision after a bench trial. Plaintiff Steffan Duplessis is an individual of Franco–Canadian ancestry. Defendants are Training & Development Corporation ("TDC") and various individuals employed by TDC. Plaintiff was employed by TDC and alleges that during his employment he was harassed by TDC employees on the basis of his national ancestry. Plaintiff is also a nonsmoker and alleges that he was harassed for asserting his right to a smoke-free work environment. Mr. Duplessis was laid off in September, 1990 due to economic cutbacks. Plaintiff reapplied for his position but was not rehired.

Plaintiff's Complaint alleges violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and the Maine Human Rights Act, 5 M.R.S.A. §§ 4551 *et seq.*, based on Defendants' alleged participation in and failure to prevent harassment and intentional failure to rehire Plaintiff. Plaintiff's Complaint also alleges violations of the Maine Whistleblowers' Protection Act, 26 M.R.S.A. §§ 831 *et seq.*, and intentional and negligent infliction of emotional distress.

Before trial, Defendants were granted summary judgment on Count III. This Count sought relief pursuant .to 42 U.S.C. § 1981. At the conclusion of the trial, Plaintiff indicated that he would not press the allegations in Counts IV and V. Accordingly, these Counts, which sought relief pursuant to the Federal and State Rehabilitation Acts, were dismissed by the Court.

The case was tried from July 12, 1993 to July 22, 1993. Having considered the pleadings, the testimony of the witnesses, the documents in evidence and the memoranda and arguments of counsel for the parties, the Court makes the following findings of facts and conclusions of law as required by Fed. R.Civ.P. 52.

### I. *Background*

#### A. *The Parties*

Steffan Duplessis was employed by TDC from August, 1988 through September, 1990.

TDC is a corporation that contracts with the Department of Labor to operate job centers providing alternative education programs. Plaintiff worked at the Penobscot Job Corps Center ("PJC") in Bangor, Maine. Mr. Duplessis was initially hired by TDC as a Residential Advisor. In January, 1989, Plaintiff became a Shift Manager. In October, 1989, the position of Shift Manager was eliminated and Plaintiff's title was changed to Senior Residential Advisor ("SRA"). These positions involved supervising Job Corps students residing in Bell Dormitory on the Husson College campus.

Through much of his employment at TDC, Plaintiff was supervised by the Manager of Residential and Recreational Life, Defendant Keith Madden. Mr. Madden reported to the Center Director, Defendant Thomas Brady. In mid-September, 1989, Madden began reporting to Defendant Gary Ray, the Group Life Director.

Defendant Margaret Beckman has been Personnel Manager since May, 1989. Before that, Ms. Beckman was Assistant Director of Human Resources. Defendant Donald Ettinger succeeded Brady as Center Director in June, 1990.

#### B. *Plaintiff's Relations with Other TDC Employees*

The testimony revealed that Mr. Duplessis was a somewhat controversial employee. Although Mr. Duplessis never received a performance review, Defendants admit that he was especially strong in planning and carrying out recreational activities for the students he supervised. The evidence also established that Plaintiff was perceived by many of his coworkers as arrogant and condescending. Some employees testified that they disliked Plaintiff because they felt he would do things his own way rather than follow established policies and procedures. Others resented Plaintiff because he recorded problems with other staff members in the dormitory log book, a semi-public document available for inspection by all staff. There was also evidence presented that at least some of the hostility directed toward Plaintiff arose from the fact that Plaintiff earned more than others in comparable positions.

Plaintiff frequently spoke French with those at work who were conversant in that language. Although this was viewed as positive by some, it drew a negative reaction from others who thought it rude and inappropriate, especially those who could not understand what was being said.

Plaintiff was disciplined by TDC on several occasions. Mr. Duplessis was reprimanded for not following established policy when he unilaterally chose not to evacuate the dorm in the face of a bomb threat. When asked to sign the reprimand for the bomb scare violation, Mr. Duplessis refused. While Plaintiff contended that the bomb scare policy was not enforced on other occasions, this contention was not supported by the weight of the evidence. Mr. Duplessis was also reprimanded for tardiness and for having his children with him at work.

## C. The Frog Symbol

Many of Plaintiff's complaints of cultural harassment center around the use of the frog as a reference to Americans of French or French–Canadian descent. The evidence presented demonstrated that the frog symbol is not always used in a derogatory manner. Several Franco–American employees at PJC adopted the symbol as an expression of their identity. Further, the Franco–American Center at the University of Maine is known as F.A.R.O.G, or Franco–American Resource Opportunity Group, a name developed to produce the desired acronym.[1] Plaintiff was a member of F.A.R.O.G.

The evidence demonstrated that while Plaintiff used the frog symbol to represent his heritage on some occasions, he showed ultra-sensitivity to certain references to French things or frogs on other occasions. For example, Plaintiff labeled as ethnic slurs former President Bush's statement that something was akin to a frog complaining about being ugly, and TDC's use of the term "french kiss" in a publication. Although Plaintiff informed some individuals that he did not want to be called a frog, he did not

eliminate the ambiguity in this regard altogether.

## D. The Atmosphere at TDC

The students at PJC are from diverse racial and ethnic backgrounds. While a significant portion of the student body comes from rural Maine, many students come from urban areas. The program is designed for disadvantaged students who have had difficulty achieving success in conventional educational programs.

The testimony suggests that PJC was not a model of cultural acceptance. Ethnic jokes and slurs occurred. Nonetheless, TDC has and continues to implement measures to promote acceptance of diverse cultures among its students and staff. Separate Equal Employment Opportunity Officers ("EEO officers") were designated for students and staff to file diversity complaints. TDC placed posters in its buildings to advertise the location and functions of the EEO officers. The effectiveness of TDC's policy depended on complainants notifying the EEO officer or the personnel department of any problems.

A high percentage of the staff at Bell Dormitory were of French ancestry. Several Franco–Americans at PJC testified that they heard references to ethnicity on the job. These references were sometimes made by Franco–Americans themselves. For example, Plaintiff admits to developing a scavenger hunt in which one of the objects sought was "a live frog (not Steffan)." Numerous witnesses of French descent testified that they did not feel their work environment was tainted by bias or discrimination. They testified that had they seen bias, they would have reported it.

## E. The Evidence of Harassment

### 1. The ceramic frog prince

In addition to testimony regarding the general atmosphere at PJC, Plaintiff presented evidence regarding five specific objects or episodes that he claims reflect the pattern of harassment to which he was sub-

---

1. This is further evidenced by the Group's telephone number which has "frog" as the last four digits.

jected. The first of the five objects was a small ceramic frog with a golden crown. Plaintiff allegedly found this object in a paper clip box in his desk shortly after he was promoted to Shift Manager. Plaintiff concedes he did not report the incident to management at any time during his employment with TDC. Plaintiff also did not mention this frog in his complaint to the Maine Human Rights Commission. Plaintiff testified that he did not report this incident because he did not understand its meaning until he was looking through his things from TDC some time after his job was terminated. Plaintiff further testified that he now believes the frog may have been left to signify that "he was a frog that had gotten too big for his britches."

### 2. The "smoking" memo

In 1989, TDC had in place a smoking policy that called for designated smoking and non-smoking areas at all TDC locations. The policy required that if there was disagreement among smokers and non-smokers regarding shared office space, the area was to be designated as non-smoking.

Plaintiff was an ardent non-smoker. He requested that others not smoke in his presence and would leave the room if others began smoking. In October 1989, Plaintiff was assigned to work in the administrative office, a shared office space. It was also an area where people would gather to collect their mail and socialize. Many who used the office were smokers. Plaintiff requested that this office be designated a non-smoking area ·or that he be transferred to another work space. On December 4, 1989, a memorandum was issued by Keith Madden designating the administrative office as a non-smoking area during Plaintiff's work hours. As a protest, Steven Snowman, one of Plaintiff's coworkers, wrote the words, "To Your Health, Frog" on a copy of the memorandum and left it on Plaintiff's desk. Plaintiff brought the memo to Madden's attention but told Madden he would confront Snowman about the note himself. Madden also spoke to Snowman but the focus of that discussion was on Snowman's unacceptable response to the smoking policy and not on the ethnic remark in his note. Snowman testified that

he wrote the note out of personal animosity towards Plaintiff and that he had no specific cultural or ethnic bias against Plaintiff.

### 3. The earring

The third discriminatory incident identified by Plaintiff was an earring presented anonymously with a note. The earring was green, and the note read, "Steffan, this is all your [sic] missing. . . . its [sic] even your color . . ., or are real frogs brown??" There was no testimony introduced identifying the source of the note, but it is alleged to have been received in February of 1990. Plaintiff testified that he had shown the earring and note to Madden after receiving it. Madden testified that he learned about the earring for the first time at the Maine Human Rights Commission hearing in 1991.

### 4. The "Ladies Companion" advertisement

On June 15, 1990, Plaintiff organized a water carnival at the dormitory. That same day, Plaintiff found a clipping from the "Bangor Daily News" in his mailbox. The ad sought a "ladies companion" (sic) ("Ladies Companion") to travel from Bangor to Florida in the winter and assist with shopping trips, etc. The ad specified "French–Canadian heritage a plus." Plaintiff testified that this part of the ad was highlighted when he received it. It is undisputed that the ad was placed in Plaintiff's mailbox by Plaintiff's coworker, Jimmy Gagnon. Gagnon testified that he gave the ad to Plaintiff because he thought it was funny and that he had no intention of causing any offense or making any adverse comment about Franco–Canadian heritage. Mr. Gagnon is also Franco–Canadian. Gagnon could not remember whether he highlighted the statement "French–Canadian heritage a plus."

While Plaintiff made Madden aware that this incident upset him, Madden apparently did not regard the incident as ethnic harassment because he understood the ad to be a joke intended to make the receiver ponder whether it could have been placed by an attractive young woman who wanted a companion. Although Madden did not discipline Gagnon, he believed Plaintiff spoke with Gag-

non on his own, and he believed Plaintiff indicated that he was satisfied with the outcome of that conversation.

On approximately June 15, 1990, Plaintiff composed a draft of a letter directed to Mr. Madden. The letter set forth Plaintiff's various complaints about the treatment he received at PJC. The letter specifically mentioned the smoking memo, the green earring and the "Ladies Companion" advertisement. It also addressed the smoking policy and Plaintiff's perception of hostility toward his use of French in the dormitory. The letter contained no reference to the crowned frog. At the end of the letter, Plaintiff indicated that he was going to file a complaint with the personnel department and various state and federal regulatory bodies. Plaintiff showed the draft to Defendant Gary Ray. Mr. Ray testified that he glanced at the letter and told Plaintiff that the allegations were strong and that if he wished to pursue the matter, a finalized letter should be delivered to the EEO officer. Plaintiff never delivered the letter to Mr. Madden or the personnel office.

### 5. The frog on the log

Plaintiff was absent from work after aggravating a work-related back injury. Plaintiff returned to work on approximately August 4, 1990. Plaintiff claims that he returned to find a ceramic frog fastened to a piece of driftwood on his desk. The frog was smoking a cigar or cigarette and a sign saying, "Don't smoke, I might croak" was fastened to the driftwood. Plaintiff testified that his efforts to find the origin of this object were to no avail. However, many TDC employees testified that the object belonged to Mona Raymond, a Residential Advisor of French descent.

Shortly after this incident Madden and Duplessis met for dinner. Plaintiff indicated to Madden that he was dissatisfied with his treatment at TDC and that he was drafting a formal complaint to file with the Maine Human Rights Commission. Plaintiff does not contend that he ever discussed the frog on a log with Madden, and Madden's testimony was that he first learned about this object at the Maine Human Rights Commission hearing. The focus of the dinner conversation was on Plaintiff's concern about how other staff responded to him.

### F. Failure to Rehire

Shortly after Plaintiff's dinner with Madden, a staff reduction occurred at the Job Corps Center. This staff reduction was due to a contract change with the Department of Labor. As a result, most employees were laid off and were required to reapply for employment at PJC. Mr. Duplessis was a Senior Residential Advisor at the time of the mass lay off. The contract change reduced the number of such positions from five to four.

Plaintiff applied for the SRA positions along with approximately fourteen other candidates. See Plaintiff's Ex. 41. Candidates submitted written applications and were interviewed by a three-person committee. The interview committee asked each applicant the same series of questions, took notes on the responses, and committee members individually rated the candidates. The numerical ratings were then combined to give each applicant a total score.

Plaintiff was one of eleven candidates interviewed by David Conroe, Defendant Margaret Beckman and Defendant Gary Ray. As a result of Plaintiff's interview he was ranked second. Conroe felt that Plaintiff was one of the best choices for the position. However, Plaintiff was not one of the four applicants selected. Plaintiff was the only incumbent SRA who scored in the top four spots to be rejected. It was the judgment of those responsible for hiring decisions, Defendant Donald Ettinger, Defendant Gary Ray, Defendant Eunice Johnson and Defendant Margaret Beckman that, based on Plaintiff's past performance, other candidates were more qualified in demonstrated leadership skills and the ability to work with others. Ms. Beckman prepared a memorandum dated September 10, 1990 setting forth the relative strengths and weaknesses of the candidates. This memorandum was later approved by Ray and Conroe. Defendant Eunice Johnson testified that memoranda regarding hiring decisions were not prepared for other positions.

## II. *Discussion*

In Counts I and II, Plaintiff alleges that TDC violated Title VII and the Maine Human Rights Act by participating in and failing to prevent harassment and by failing to rehire Plaintiff because of his ethnicity.

### A. *Counts I & II—Hostile Work Environment*

■ Participating in and failing to prevent harassment may be the basis of a hostile work environment claim. While there is an abundance of case law regarding racially or sexually hostile work environments, there is little national origin discrimination case law. However, the principles applicable to sexual and racial harassment apply to harassment on the basis of national origin. *See Boutros v. Canton Regional Transit Authority,* 997 F.2d 198, 202 (6th Cir.1993 as corrected July 14, 1993).

■ To prevail on a hostile work environment claim under federal and state law,[2] Plaintiff must prove the following three elements:

1. unwelcome comments, jokes, acts and other verbal or physical conduct of an ethnic nature in the workplace; and

2. such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment; and

3. the employer, or its agents or supervisory employees, knew or should have known of the conduct.

*See Harris v. International Paper Co.,* 765 F.Supp. 1509, 1513 (D.Me.1991); 29 C.F.R. § 1606.8(b)–(c); MHRC Reg. 3.09(F)(1). The employer-defendant may rebut a prima facie case by showing it took immediate and appropriate corrective action. *Id.*

With respect to the first element, the parties agree that there were some unwelcome and inappropriate comments and conduct demeaning to Franco–Americans that occurred in the workplace. At issue is their frequency and severity.

■ With respect to the second element, Plaintiff must establish that the anti-French comments or acts created a hostile work environment. A hostile work environment is one in which the harassment is sufficiently severe or pervasive to alter the condition of Plaintiff's employment and create an abusive working environment. *Id.* (citations omitted). "The incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief." *Kotcher v. Rosa & Sullivan Appliance Center, Inc.,* 957 F.2d 59, 62 (2d Cir.1992) (citations omitted).

■ *International Paper* held that "[s]ince the concern of Title VII and the MHRA is to redress the effects of conduct and speech on their victims, the fact finder must 'walk a mile in the victim's shoes' to understand those effects and how they should be remedied." *International Paper,* 765 F.Supp. at 1516. Accordingly, the appropriate standard to be applied in determining whether Mr. Duplessis was subjected to hostile environment harassment is that of a "reasonable Franco–American." Whether the conduct complained of is sufficiently pervasive to create a hostile or offensive work environment must be determined from the totality of the circumstances. *Rosa & Sullivan,* 957 F.2d at 63 (citation omitted); 29 C.F.R. § 1604.11(b) (1986).

■ With respect to the third element, employers will be held liable for hostile environment harassment by their supervisors and by the victim's coworkers if "an official representing the institution knew, or in the exercise of reasonable care, should have known, of the harassment's occurrence, *unless* that official can show that he or she took appropriate steps to halt it." *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 901 (1st Cir.1988), *noted in International Paper,* 765 F.Supp. at 1516 (emphasis in original). In determining whether Defendants had knowledge, the perpetrator's perspective on whether the conduct or speech is unwelcome or pervasive is relevant. *International Paper,*

---

**2.** Federal case law provides significant guidance in the construction of the Maine Human Rights Act. *Me. Human Rights Comm'n v. City of Au-*

*burn,* 408 A.2d 1253, 1261 (Me.1979) (citations omitted).

765 F.Supp. at 1515. The mere existence of a grievance procedure and a policy against discrimination, coupled with the victim's failure to invoke that procedure, will not insulate the employer from liability. *Id.* at 1516 (citation omitted). However, the propriety of Defendants' response to any complaint must be judged by the severity of the harassment. *See DeGrace v. Rumsfeld,* 614 F.2d 796, 805 (1st Cir.1980).

█ Since the parties agree that Mr. Duplessis was subjected to unwelcome comments and conduct of an ethnic nature, the first element of Plaintiff's prima facie case has been established.

The second element requires a determination of whether the conduct in question created a hostile work environment. The extent to which ethnic slurs were used at PJC was the subject of conflicting testimony. While there was some evidence presented indicating that ethnic jokes and slurs occurred at PJC, the evidence demonstrated the at least some of the inappropriate activity was engaged in by Franco–Americans themselves, including Plaintiff. *See, e.g., Powell v. Missouri State Highway and Transp. Dept.,* 822 F.2d 798, 801 (8th Cir.1987) (plaintiff's participation in harassment examined for credibility assessment). Numerous witnesses of French descent testified that they did not feel the work environment at the Job Corps Center was tainted.

Despite this, some of the conduct which occurred at PJC was clearly inappropriate. The Court finds Snowman's notation "To Your Health Frog" on the memorandum regarding the change in smoking policy particularly offensive. The Court is also persuaded that several people referred to Plaintiff in ethnically derogatory terms behind his back. While the Court believes that these comments were motivated by personal dislike for

Plaintiff, the motivation of such conduct can not be used as a justification. *See International Paper,* 765 F.Supp. at 1515–16. If it could, harassers would be the arbiters of when it would be acceptable to use these tactics in the workplace.

Plaintiff has not satisfied the Court, however, that all the objects and incidents would be offensive to a reasonable Franco–American.[3] The Court finds that a reasonable Franco–American would not have found the "Ladies Companion" ad offensive. At least three fellow Franco–American employees, Lisa Moeller, Leonard Clukey and James Gagnon found the ad humorous and unoffensive. However, because the Court must examine the totality of the circumstances, the Court can not rely on how a reasonable Franco–American would view this item alone. *Burns v. McGregor Electronic Indus., Inc.,* 955 F.2d 559, 564 (8th Cir.1992) (district court should not carve work environment into a series of discrete incidents).

While the Court does not condone many of the activities that took place at PJC, the Court is not persuaded that the conduct rises to the level of a Title VII violation. While the conduct seems to have altered *Plaintiff's* working environment, the evidence clearly established that Plaintiff is not a reasonable Franco–American but, rather, one with an "eggshell psyche." *See Gammon v. Osteopathic Hosp. of ME, Inc.,* 534 A.2d 1282, 1285 (Me.1987). This was evidenced, for example, by Plaintiff's testimony that he was offended by a comment about frogs made by former President Bush, and a reference to "french kissing" in a TDC publication. These references bore no relation to those of French descent.

The Court is also not persuaded that the incidents in question can be classified as repeated and continuous. Case law support-

3. Plaintiff testified that he never spoke to an EEO officer, never encouraged others to do so and never filed a formal complaint with respect to any of his allegations of harassment. This is so, even though Plaintiff testified that he knew the identity of the EEO officer designated to receive such complaints. Further, Plaintiff went directly to the personnel office when he had a complaint about the smoking policy. Plaintiff also testified that he had good access to and good rapport with Center Director Thomas Brady. Plaintiff went directly to Mr. Brady with respect to other matters.

While the availability of a grievance procedure, coupled with the victim's failure to seek redress is insufficient to shield the employer from liability, the Court believes Plaintiff's failure to report in this case goes against his assertion of the offensiveness and pervasiveness of the harassment alleged.

ing such a finding involves factual scenarios significantly more egregious than the situation presented here. *See, e.g., Daniels v. Essex Group, Inc.,* 937 F.2d 1264 (7th Cir. 1991); *International Paper,* 765 F.Supp. 1509 (D.Me.1991); *Robinson v. Jacksonville Shipyards, Inc.,* 760 F.Supp. 1486 (M.D.Fla. 1991).

The third element of Plaintiff's hostile work environment claim requires determining what TDC knew or should have known about the incidents in question and whether TDC's response to any known harassment was appropriate. With regard to the general atmosphere at PJC, the Court is persuaded that the environment was not so laden with ethnic incidents as to put TDC on constructive notice that corrective action was necessary.

With regard to the specific incidents, Plaintiff testified that he informed no one of the frog prince he allegedly received. All parties agree that Plaintiff directly notified Defendant Keith Madden of the smoking memorandum and the "Ladies Companion" ad at the time they were received. The Court finds that Defendants were not notified of the earring and accompanying note received by Plaintiff in February, 1990. Plaintiff testified that he showed the earring and note to Madden after receiving it. However, the Court finds more credible Madden's testimony that he learned about the earring for the first time at the Maine Human Rights Commission hearing in 1991. Madden admitted to being told about the smoking memo and the "Ladies Companion" ad. Further, Plaintiff's description of Madden's reaction when allegedly presented with the earring was vague. Plaintiff's failure to report the note and earring is also evidenced by the

letter Plaintiff drafted on June 15, 1990. In that letter, Plaintiff refers specifically to the "Ladies Companion" ad, the smoking memo, and the smoking policy and Madden's actions or failure to act with respect to them. Plaintiff does not mention in the letter that he showed the note and earring to Madden. For these reasons, the Court finds Plaintiff did not make management aware of the anonymous note and earring. With respect to the frog on the log, Plaintiff's testimony demonstrated that he decided to investigate the incident on his own.[4] Plaintiff testified that he told Defendant Gary Ray about the object and that Mr. Ray asked him if he was going to include the incident in his letter to Mr. Madden and the personnel office. The Court finds that Mr. Ray had notice of this incident; however, it is not clear when and how he got such notice.

Because the Court finds that Defendants had knowledge of at least three harassing incidents, the appropriateness of Defendants' response to those incidents must be examined.

Both Plaintiff and Snowman testified that Madden spoke to Snowman about the smoking memo and that Snowman never harassed Plaintiff again. Al Cooper, another TDC employee testified by deposition that Madden spoke to a group of SRA's after the incident about the inappropriateness of the use of the word "frog" as well as the inappropriateness of leaving anonymous notes to complain about the change in smoking policy. The Court finds Madden's, and therefore TDC's, response to this incident appropriate because it was sufficient to make Snowman aware that harassment would not be tolerated. *See Rosa & Sullivan,* 957 F.2d at 63.[5]

---

4. Paul Hubbard, a former TDC employee and Plaintiff's friend, testified that he saw the frog being placed on Plaintiff's desk by co-workers who wanted to annoy Plaintiff. However, Plaintiff testified that he asked many people about the incident and did not uncover any information regarding the origin of this object or how it came to be placed on his desk. The Court finds little merit in Hubbard's testimony because, if true, the Court believes Hubbard would have brought this information to Plaintiff's attention earlier than three years after the event.

The Court also finds little credence in Plaintiff's contention that he did not know or subse-

quently find out that the true owner of the object was Mona Raymond. Ms. Raymond's ownership seemed to be common knowledge among other employees.

5. Mr. Snowman was subsequently fired by TDC for insensitivity to diversity issues. Snowman then filed both a workers' compensation claim and a Maine Human Rights Act complaint. The Maine Human Rights Act complaint was based on alleged reverse discrimination. That complaint was dismissed by the Maine Human Rights Commission. Mr. Duplessis assisted Mr. Snowman in both of Mr. Snowman's claims against TDC.

**680**

With respect to the "Ladies Companion" ad, the Court finds Plaintiff indicated to Madden that he had spoken to Gagnon and satisfactorily resolved the issue. An employee is not entitled to satisfaction for every perceived slight no matter how trivial or imagined. *See Rumsfeld,* 614 F.2d at 805 (seriousness of the conduct is a factor to be considered). The Court agrees with those who testified that they did not believe the ad constituted an ethnic slur. Therefore, the Court finds Madden's response reasonable under the circumstances.[6]

Plaintiff testified that he believed he informed Gary Ray of the frog on a log which appeared on his desk or that Mr. Ray was otherwise made aware of this incident. Plaintiff further testified that Mr. Ray's response was to ask Plaintiff if he was going to include the incident in the letter he was drafting for Mr. Madden and the personnel office. If Ray did ask this question, it may have been to determine if Plaintiff was going to report this incident through the procedure designated by TDC and known by Plaintiff as the proper mechanism for handling such matters. Plaintiff showed a propensity toward handling these matters his own way. Because of this, the Court can not fault Ray's apparent desire to know if Plaintiff was going to follow TDC's policy and have this matter investigated properly.

TDC's Employee Handbook provides:

If you feel you have been discriminated against here at TDC contact the Personnel Department immediately. A firm belief in the inherent dignity and respect of every individual is at the heart of TDC's corporate philosophy. We will not tolerate anything less than the highest standards of professional courtesy for or from our employees.

Defendants' Ex. 21.

TDC's commitment to this philosophy was evidenced by employee David Keene's testimony that he was counseled by personnel for referring to a black student as a "member of our black community." This commitment was further elicited through Mr. Cooper's testimony that he felt TDC was "super-sensitive" to diversity issues.

Plaintiff conceded that he had received the Handbook as well as some training with respect to identifying and reporting discrimination while at TDC.

It [is] not always ... within an employer's power to guarantee an environment free from all bigotry. He cannot change the personal beliefs of his employees; he can let it be known, however, that racial harassment will not be tolerated, and he can take all reasonable measures to enforce this policy.

*Rumsfeld,* 614 F.2d at 805.

Viewing the record as a whole, the Court is satisfied that TDC did not condone employee misconduct but, when notified, took immediate and appropriate measures to combat and prevent it. *Id.* Accordingly, the Court enters judgment in favor of Defendants on the hostile work environment allegations in Counts I and II of Plaintiff's Complaint.[7]

**B.** *Counts I & II—Discriminatory Failure to Rehire*

■ Under Counts I and II, Plaintiff also alleges that Defendants intentionally failed to rehire him because of his national ancestry. Title VII provides that it is unlawful "for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... national origin." 42 U.S.C. § 2000e–2(a)(1).[8]

---

6. Considering that Gagnon is a Franco–American himself, the Court doubts that any further response by TDC would have made Gagnon more sensitive to the right of fellow Franco–American employees to be free from harassment based on their ethnicity.

7. In light of the Court's ruling for Defendants on these Count I and II allegations, the Court does not address Defendants' statute of limitations argument and Plaintiff's "continuing violation" and "equitable tolling" counter-arguments.

8. 5 M.R.S.A. § 4572(1)(A) (1979) reads:

§ 4572 Unlawful employment discrimination
1. Unlawful employment. It shall be unlawful employment discrimination, in violation of this Act, except where based on a bona fide occupational qualification:

The Supreme Court has articulated a three-step, burden-shifting analysis to be applied in the context of disparate treatment employment discrimination cases where there is no direct evidence of discrimination. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–54, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973). The *McDonnell Douglas* framework allows a court to analyze circumstantial evidence by creating inferences of discriminatory intent. *Hawkins v. Ceco Corp.*, 883 F.2d 977, 981 (11th Cir.1989). A court accords proper weight to the evidence by shifting burdens of proof. *Id.* However, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *St. Mary's Honor Ctr. v. Hicks*, —— U.S. ——, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993) (citing *Burdine*, 450 U.S. at 253); *Samuels v. Raytheon Corp.*, 934 F.2d 388, 391 (1st Cir. 1991) (citing *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093).

Under *McDonnell Douglas*, a plaintiff is first required to create an inference of discriminatory intent by establishing a prima facie case of discrimination. There are a number of ways of establishing such a case pursuant to *McDonnell Douglas. See Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir.1984). If a plaintiff cannot establish a prima facie case, then the defendant need not present any reason for its action and the court must determine if the plaintiff has met its ultimate burden. *Ceco*, 883 F.2d at 981. If the plaintiff does present a prima facie case, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for the employment action. *Hicks*, —— U.S. at ——, 113 S.Ct. at 2747. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the plaintiff has the opportunity to present evidence that the proffered reason is pretextual. *Id.* (citation omitted).

One manner of establishing a prima facie case requires a plaintiff to show (1) that he was a member of a protected class, (2) that he was qualified for the position, (3) that he was discharged (or as here, not rehired), and (4) that he was replaced by one outside the protected class. *See Marks v. Prattco, Inc.*, 607 F.2d 1153, 1155 (5th Cir.1979); *See also City of Auburn*, 408 A.2d at 1263.[9] Four people were hired for the SRA positions. At least two of those hired were Franco–Americans, and none were specifically hired in Plaintiff's stead. Therefore, Plaintiff has failed to establish an essential element of his prima facie case.

Even assuming that Plaintiff had established a prima facie case, the Court is not persuaded that Defendants' proffered reasons for failing to rehire Plaintiff were pretextual and that Plaintiff was the victim of intentional discrimination. Defendants presented substantial evidence of Plaintiff's inability to work well with others. There was uncontroverted testimony from Andrea Hand, Director of Counseling, that no counselors wanted to work with Plaintiff. These individuals did not work in the administrative office and were therefore unaffected by the smoking policy. There was no evidence presented to indicate that the dislike expressed toward Plaintiff by the counselors had any relation to Plaintiff's national heritage or his anti-smoking stance. There was also significant evidence demonstrating that Plaintiff was not liked by fellow staff members.

---

**A.** For an employer to fail or refuse to hire or otherwise discriminate against any applicant for employment because of ... national origin ... or discriminate with respect to hire, tenure, promotion, transfer, compensation, terms, conditions or privileges of employment, or any other matter directly of indirectly related to employment....

9. Other ways to establish a prima facie case of intentional discrimination include presenting statistical evidence of a pattern of discrimination or showing that the plaintiff was qualified for the position and was discharged for misconduct which was nearly identical to that engaged in by one outside of the protected class whom the employer retained. *See Ceco Corp.*, 883 F.2d at 985 (11th Cir.1989). Since Plaintiff did not present any statistical evidence, and because both parties agree that Plaintiff was discharged due to economic cutbacks, these methods are inapposite.

While the evidence indicated that the smoking policy gave rise to some resentment it did not, as Plaintiff argues, indicate that Mr. Duplessis' relationship with coworkers was tainted by ethnic harassment. Testimony showed that fellow employees disliked Plaintiff because he received more money than them, followed his own rules and was perceived as receiving special treatment from management, being arrogant, intimidating and unyielding. While some of these reasons may be petty, harassment so engendered does not violate Title VII.

Although the evidence suggested that Defendants deviated somewhat from the standard selection procedure in Plaintiff's case, the Court is satisfied that this deviation was not a result of intentional discrimination. As in the District Court opinion affirmed in *Hicks*, although Plaintiff has proven the existence of a crusade not to rehire him, he has not proven that the crusade was ethnically rather than personally motivated. *Hicks*, —— U.S. at ——, 113 S.Ct. at 2748 (citing *Hicks v. St. Mary's Honor Ctr.*, 756 F.Supp. 1244, 1252 (E.D.Mo.1991)). Plaintiff has failed to prove that the treatment, if unfair, was motivated by Plaintiff's ancestry. Accordingly, Plaintiff's claims based on intentional discrimination under Title VII and the Maine Human Rights Act fail.

## C. Count VI—Whistleblowers' Protection Act

Plaintiff argues Defendants violated Maine's Whistleblowers' Protection Act, 26 M.R.S.A. § 831 *et seq.*, by participating in and failing to prevent harassment of Plaintiff in connection with his desire to have a smoke-free work environment and by refusing to select Plaintiff to continue his employment. Section 833 provides:

1. Discrimination Prohibited. No employer may discharge, threaten or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because:

A. The employee, acting in good faith, or a person acting on behalf of the employee, reports orally or in writing to the employer or a public body what the employee has reasonable cause to believe is a violation of the law or rule adopted under the laws of this State, a political subdivision of this State or the United States.

26 M.R.S.A. § 833.

■■■■ Plaintiff's Whistleblowers' Protection Act claim is based on Defendants' alleged violation of Maine's Workplace Smoking Act, 22 M.R.S.A. § 1580–A et seq. To establish liability under the Whistleblowers' Protection Act, Plaintiff must establish that: "(1) he engaged in activity protected by statute, (2) he was the subject of adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action." *Bard v. Bath Iron Works Corporation*, 590 A.2d 152, 154 (Me.1991) (citing *Moon v. Transport Drivers, Inc.*, 836 F.2d 226, 229 (6th Cir.1987)). Assuming arguendo that Plaintiff did engage in protected activity, the Court is not satisfied Plaintiff established a causal link between his request for a non-smoking workplace and Defendants' decision not to rehire him. Even considering the tension between Plaintiff and coworkers as a result of Plaintiff's requested change in the administrative office smoking designation, as discussed previously, Defendants established substantial, legitimate non-discriminatory reasons not to rehire Plaintiff. These reasons were unrelated to the issue of smoking in the workplace. Therefore, Plaintiff has not proven a causal link between protected activity and the adverse employment action.

■■■■ Plaintiff also contends that coworker harassment regarding the smoking policy constituted prohibited discrimination under the Whistleblowers' Protection Act. Defendants argue that employees are not protected from harassment under that Act. In support of his harassment theory, Plaintiff analogizes to *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 64–65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986) where the Supreme Court held sexual harassment constituted prohibited discrimination under Title VII. However, even if harassment constitutes prohibited discrimination under the Whistleblowers' Protection Act, as in Title VII cases, such a violation could only be found if the employer failed to take appropriate corrective action. In this

case, on the one occasion where harassment with respect to the smoking policy was reported, the harasser, Steve Snowman, was immediately counseled. The Court therefore concludes that if harassment is actionable under the Whistleblowers' Protection Act, it would not be actionable on the facts presented here.

Accordingly, the Court enters judgment in favor of Defendants on the merits of Count VI of Plaintiff's Complaint.

### D. *Count VII—Intentional Infliction of Emotional Distress*

■ Count VII of Plaintiff's Complaint alleges a cause of action for intentional infliction of emotional distress. To prevail on such a claim, Plaintiff must prove:

1. the defendant intentionally or recklessly inflicted severe emotional distress or was certain that such distress would result from his conduct;

2. the conduct was so "extreme and outrageous" as to exceed "all possible bounds of decency" and must be regarded as "atrocious, and utterly intolerable in a civilized community;"

3. the actions of the defendant caused the plaintiff's emotional distress; and

4. the emotional distress suffered by the plaintiff was so "severe" that "no reasonable [person] could be expected to endure it."

*Henriksen v. Cameron,* 622 A.2d 1135, 1139 (Me.1993) (quoting *Vicnire v. Ford Motor Credit Co.,* 401 A.2d 148 (Me.1979)).

The Court finds that Defendants' conduct was not so severe and outrageous as to exceed all possible bounds of decency. In fact, as discussed previously, the Court is satisfied that Defendants' conduct was appropriate under the circumstances. Accordingly, Plaintiff has failed to sustain his claim of intentional infliction of emotional distress.

### E. *Count VIII—Negligent Infliction of Emotional Distress*

■ Count VIII of Plaintiff's Complaint seeks relief for negligent infliction of emotional distress. To prevail on this claim, Plaintiff must prove:

1. that Defendants failed to exercise reasonable care in keeping the workplace free from harassment;

2. that Defendants' failure caused Plaintiff severe emotional distress;

3. that Defendants' failure would have caused a reasonable person severe emotional distress; and;

4. that the harm was foreseeable.

*See Salley v. Childs,* 541 A.2d 1297 (Me. 1988); *Gammon v. Osteopathic Hospital of Maine, Inc.,* 534 A.2d 1282 (Me.1987). Despite the fact that several incidents of harassment occurred at PJC, the Court is persuaded that Defendants exercised reasonable care in keeping the workplace free from harassment. Accordingly, Plaintiff's claim under this theory fails as well.[10]

### III. *Conclusion*

In accordance with the foregoing findings of fact and conclusions of law, the Court enters judgment in favor of Defendants and against Plaintiff on the merits of Counts I, II, VI, VII and VIII of Plaintiff's Complaint.

*SO ORDERED.*

---

10. In light of the Court's conclusion that Plaintiff failed to sustain his common law allegations, the Court does not address Defendants' contention that Maine's Workers' Compensation statute, 39 M.R.S.A. § 4, could be interpreted to preclude recovery for such claims.