Gloria J. BLONG, Plaintiff,

v.

SECRETARY OF the ARMY, Togo D. West, Jr., Major General James F. Rueger and Richard E. Cordwell, Defendants.

Civ. A. No. 93–4147–DES.

United States District Court, D. Kansas.

May 19, 1995.

Alan V. Johnson, Sloan, Listrom, Eisenbarth, Sloan & Glassman, Topeka, KS, for plaintiff.

Jackie A. Rapstine, Office of U.S. Atty., John R. Mettner, Jr., Topeka, KS, for Secretary of Army.

David D. Plinsky, Office of the City Atty., City of Topeka, John J. Knoll, Office of the Atty. Gen., Topeka, KS, for James F. Rueger and Richard E. Cordwell.

### MEMORANDUM AND ORDER

SAFFELS, District Judge.

## I. INTRODUCTION

This matter is before the court following trial without a jury. Plaintiff claims she was discriminated against and denied employment as a federal civilian technician by the Kansas Army National Guard because of her gender in violation of Title VII, 42 U.S.C. § 2000e et seq.

Defendants must prevail in this case. After carefully considering all the evidence before it, the court finds there is absolutely no competent evidence of any gender bias on the part of the Kansas Army National Guard as it relates to this plaintiff.

The court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## II. FINDINGS OF FACT

1. The plaintiff, Gloria J. Blong, is a woman who applied, and was qualified, for the "competitive" position of Supply Clerk at the United States Property and Fiscal Office ("USPFO"), Kansas Army National Guard ("KANG").[1]

2. On April 10, 1991, in Announcement No. 056, the KANG published an opening for a Supply Clerk (Typing) GS–04 in the USPFO. The position was "competitive." It became available in March of 1991, when the previous clerk, Daniel Piper, was promoted.

3. Announcement No. 056 identified Master Sergeant ("MSG") Robert D. Bottom, Warehouse Worker Foreman, as the selecting supervisor. The Announcement explained that "ONLY THE EXPERIENCE AND QUALIFICATIONS YOU SHOW ON THE STANDARD FORM 171 CAN BE USED TO EVALUATE YOUR QUALIFICATIONS FOR THIS POSITION." It also cautioned applicants that they should "CAREFULLY READ AND COMPLY WITH INSTRUCTIONS CONTAINED ON THE STANDARD FORM 171 AND THIS JOB ANNOUNCEMENT SO THAT YOU INCLUDE ALL INFORMATION REQUIRED." It set forth the position's qualifications as follows:

QUALIFICATIONS: As reflected in U.S. Office of Personnel Management Handbook X–118: Applicants must have the kind and length of experience as follows:

GENERAL EXPERIENCE: Application must indicate 1 year of general experience which is clerical or office work of any kind which has demonstrated the ability to perform satisfactorily at the grade level of the position.

SPECIALIZED EXPERIENCE: Application must indicate 2 years of specialized experience which is supply work or closely related activities: (a) which has required the applicant to acquire and apply knowledge of the rules, regulations, procedures, and program requirements of one or more areas of a supply system; and (b) which has demonstrated the applicant's ability to perform at the level of the position to be filled.

4. On April 16, 1991, plaintiff submitted a Standard Form 171 ("SF171") in response to Announcement No. 056.

5. Linda Rein, Personnel Staffing Specialist for the KANG, determined plaintiff possessed the basic qualifications set forth in the Announcement.

6. In addition to plaintiff, three other individuals submitted SF171s. However, none of these individuals met the basic requirements and were not deemed qualified for the position.[2]

7. Ms. Rein sent MSG Bottom a memorandum requesting him to interview "each

---

1. Technical positions with the KANG are designated as either "competitive" or "excepted." A "competitive" position does not require concurrent military membership in the National Guard, but an "excepted" position does.

2. Although they failed to meet the basic requirements, it still is unclear whether any of the three individuals were "qualified." For example, their exclusion from further consideration may have been due only to their failure to comply with any of the Announcement's technical requirements.

qualified applicant listed." Plaintiff was the only applicant listed as qualified.

8. MSG Bottom personally contacted plaintiff May 13, 1991, to schedule an interview for May 15, 1991, at 1:00 p.m.

9. MSG Bottom had been a supervisor only five months and was very busy preparing for deployment. As a result, Chief Warrant Officer ("CWO") Richard Cordwell offered to conduct the interview. MSG Bottom accepted.

10. In May of 1991, CWO Cordwell was the USPFO warehouse supervisor. He had been the supervisor since 1990 and was the assistant warehouse supervisor between 1983 and 1990.[3]

11. In May of 1991, there were 14 warehouse employees—including CWO Cordwell—of which only one was female.

12. Prior to interviewing plaintiff, CWO Cordwell contacted Ms. Rein to inform her of his intention to substitute himself for MSG Bottom and make sure the switch was allowed. Ms. Rein informed him he could conduct the interview even though he was not identified as the supervising official.

13. He then reviewed plaintiff's application packet and prepared notes to refer to during the interview.

14. He also contacted Roland Kassebaum to inquire about plaintiff.

15. Cordwell knew that Kassebaum, the Stock Control Supervisor, had interviewed plaintiff for a similar supply clerk (typing) position within the stock control area of USPFO and that Kassebaum had hired another individual for that position.

16. Mr. Kassebaum had more negative than positive comments about plaintiff. Mr. Kassebaum specifically noted that plaintiff was late for her interview appointment and that she was adamant that she would not work late.

17. CWO Cordwell did not contact any of the individuals plaintiff listed as references because plaintiff was so well known within the unit and among the people in the KANG.

18. Plaintiff arrived for the interview late and appeared untidy, unclean and inappropriately dressed for an interview.

19. CWO Cordwell interviewed plaintiff for approximately 30 to 40 minutes. During the interview, Cordwell provided general information about matters such as insurance, sick leave, annual leave, "comp time," and flex time.

20. He informed plaintiff she would possibly be required to attend "ENABLE" computer training even though he knew from her application that she had experience working with computers and had attended two levels of "ENABLE" training. Cordwell believed that if one had not recently been working with the system, updated training might be necessary.

21. Cordwell described the basic job duties, but did not specifically ask plaintiff about her previous work experience.

22. Throughout the course of the interview, plaintiff interrupted Cordwell in a rude and brusque manner.

23. Plaintiff provided Cordwell material to supplement her SF171.[4] He accepted, and reviewed, the supplementary material even though he believed regulations allowed him to disregard information not included in an applicant's SF171.

24. The interview concluded with a tour of the warehouse job site.

25. Plaintiff was introduced to Dan Piper, the former supply clerk who had taken another job in the warehouse. Piper showed the plaintiff the work space and briefly discussed the job with her.

26. During the interview, Cordwell found plaintiff overbearing, disruptive, and inappropriately dressed in clothes which were too

---

**3.** MSG Bottom was the assistant warehouse foreman when plaintiff applied. Any decision he would have made regarding plaintiff's employment would have had to have been approved by CWO Cordwell as well as those in the chain-of-command above Cordwell.

**4.** The information consisted of a Non–Commissioned Officer rating and a letter of recommendation. Both were very favorable.

tight and too revealing. Plaintiff did not make a favorable impression.

27. CWO Cordwell and MSG Bottom discussed the plaintiff and her application following the interview. Since both had personal experience with plaintiff, Bottom as plaintiff's platoon sergeant and Cordwell as a coworker at the USPFO during the 1970s and 1980s, they were aware of plaintiff's attendance record, work performance, attitude, and ability to work with people.

28. Cordwell, Bottom and Lt. Colonel Joe Broyles further discussed the plaintiff, her qualifications, her detriments and their desire to fill the position with the best possible person.

29. Broyles was Cordwell's immediate supervisor and had to approve any selection made by Cordwell.

30. Cordwell, Broyles, Bottom could recall no instances where a selecting supervisor's choice for a position was overruled by the next person in the chain of command. However, all testified that this approval was not a rubberstamp, but came after thorough discussion about applicants for the position.

31. Broyles also knew the plaintiff from working in with her at the USPFO and was aware of her tardiness and her difficulty getting along with people. Broyles had also been present when plaintiff interviewed unsatisfactorily with Roland Kassebaum.

32. Cordwell considered plaintiff only minimally qualified and believed there were potential applicants with more specialized supply experience who would apply if the position was reannounced.

33. Cordwell, Bottom and Broyles decided to reannounce the position, as excepted, in order to obtain a larger pool of qualified applicants.

34. On March 17, 1991, CWO Cordwell sent plaintiff a standard form letter advising her she had not been selected and inviting her to apply for future openings. The letter did not inform her the position was being reannounced as excepted in order to obtain a larger pool of qualified applicants.

35. The KANG's Merit Placement/Promotion Plan allows "management" to "expand the area of consideration for a particular placement action when it has been determined that the initial area did not produce a sufficient number of qualified candidates."

36. Neither the Merit Placement/Promotion Plan nor the KANG's policies require a selecting supervisor to reannounce a position when the pool of qualified applicants consists of a single person. Reannouncement is discretionary.

37. The Supply Clerk (Typing) position was reannounced May 29, 1991, in Announcement No. 084, as an "excepted" position with basic qualifications different from those set forth in Announcement No. 056. Specifically, Announcement No. 084 required applicants to have the following qualifications:

### QUALIFICATIONS:

**GENERAL EXPERIENCE:** Experience in clerical or office work such as maintaining records, screening, reviewing, and verifying documents; searching for and compiling information and data; or work involved in the physical handling of supplies and equipment, provided this gave the candidate some general knowledge of supply transactions and regulations, procedures, identification codes, etc.

**SPECIALIZED EXPERIENCE:** Application must indicate 3 months experience and/or appropriate training in supply work or closely related activities in which the applicant has acquired and applied knowledge of the rules, regulations, procedures and program requirements of one or more areas of a supply system and which demonstrated the applicant's ability to perform at the level of the position to be filled.

38. These qualifications are different than those announced in the competitive position. The qualification standards for excepted positions are dictated by the National Guard Bureau ("NGB") while qualification standards for competitive positions are dictated by the Office of Personal Management ("OPM").

39. Cordwell, Bottom, and Broyles, therefore, had no hand in determining the acceptable qualifications for either the competitive or the excepted position. In fact, none of

them knew that the qualifications were different between the two positions.

40. Plaintiff learned of the reannouncement, prior to its closure, when SGT Linda Rein personally told plaintiff that the job had been reannounced as excepted.

41. On Ms. Rein's suggestion, plaintiff telephoned CWO Cordwell who told her that (1) the "competitive" position was not filled because the pool of "qualified" applicants was too small and (2) the "excepted" position still was open.

42. In addition, as with all job announcements for open positions with the KANG, the reannouncement of the supply clerk position was posted in many places, including all National Guard Armory bulletin boards.

43. Plaintiff had learned of the initial supply clerk announcement, No. 056, by seeing the announcement on a bulletin board at the National Guard Armory during a weekend drill as part of her membership in the National Guard.

44. Six individuals applied for the "excepted" Supply Clerk (Typing) position. Plaintiff was not one of the six.

45. Of the six applicants, five were rated "qualified" and one "unqualified."

46. Of the five qualified applicants, three were female and two were male.

47. MSG Bottom interviewed each "qualified" applicant.

48. He selected a female, JoAnn Call, as the best qualified.

49. CWO Cordwell and Colonel Eldon Johnson, Cordwell's supervisor, approved Ms. Call.

50. Ms. Call was appointed to the position on July 29, 1991, slightly more than one month after plaintiff filed her formal complaint of sex-based discrimination.

51. Plaintiff told Ms. Rein and the EEO Counselor that she was not interested in an "excepted" position.

52. Plaintiff initially sought Equal Employment Opportunity ("EEO") counseling on June 24, 1991.

53. George Medina, of the Kansas Air National Guard, was the EEO counselor assigned to plaintiff's case.

54. The matter was not resolved by the informal counseling process and, on June 27, 1991, plaintiff filed a formal complaint alleging that the KANG had discriminated against her on the basis of her gender when she was not selected for the Supply Clerk position.

55. The complaint was investigated on October 15, 16 and November 4, 1991.

56. At the close of the investigation another attempt at informal resolution was proposed and on February 14, 1992, the agency issued a proposed disposition finding no discrimination.

57. Plaintiff filed a timely request for a hearing before an administrative law judge from the Equal Employment Opportunity Commission.

58. On February 23, 1993, Administrative Law Judge, Tatjana V. Schwendinger found that plaintiff had not established a prima facie case of gender discrimination.

59. Plaintiff filed her complaint in this court on June 28, 1993.

60. During the course of discovery, it became apparent that plaintiff had made misrepresentations on her federal application for employment, SF171.

61. Specifically, plaintiff stated that she had never been terminated from a job when, in fact, she had been fired from Southwestern Bell Telephone Company for taking unauthorized leave and for falsifying a company document.

62. In addition, plaintiff had misrepresented on at least one SF171 her mental health history including her attempted suicide and treatment thereof.

63. Finally, plaintiff stated on one SF171 that she had never been rejected for military service, but admitted on another form that she had been so rejected.

## III. CONCLUSIONS OF LAW

1. This is a proper Title VII action and jurisdiction and venue properly lie in this court.

**1582**

2. Title VII, 42 U.S.C. § 2000e, *et seq.,* prohibits employment discrimination on the basis of race, color, religion, sex or national origin in the hiring compensation, conditions of employment and dismissals.

3. Blong raises one claim of employment discrimination alleging that defendant unlawfully denied her employment, for which she was qualified, due to her gender.

4. The test set forth in *McDonnell Douglas v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), is the applicable standard for this court's analysis.

■ 5. The order and allocation of proof in a case challenging a Title VII employment discrimination is found in *McDonnell, supra,* and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–253, 101 S.Ct. 1089, 1093–1094, 67 L.Ed.2d 207 (1981). The three-step procedure requires that the plaintiff establish a prima facie case of discrimination. *Burdine,* 450 U.S. at 252–253, 101 S.Ct. at 1093–1094. Second, if the plaintiff establishes the prima facie case, the burden shifts to the defendant "to articulate a legitimate, non-discriminatory reason for the employee's rejection." *Id.* at 253, 101 S.Ct. at 1093. Third, if the defendant carries this burden, the plaintiff has an opportunity to prove defendant's reasons are merely a pretext for discrimination.

■ The prima facie case is made when the plaintiff shows: (1) that she belongs to a protected class; (2) that she applied, and was qualified, for a job for which the employer was seeking applicants; (3) that, despite her qualifications, she was rejected; and (4) that, after her rejection, the position remained open and the employer continued to seek applicants from persons of plaintiff's qualifications. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824.

## IV. DISCUSSION

■ Blong, a woman, can show that (1) she belongs to a protected class; (2) she applied for a job for which she was qualified; (3) she was not hired; and (4) the position was reannounced. Despite defendant's argument to the contrary, the court finds that plaintiff met her initial burden of establishing a prima facie case of discrimination. The burden of establishing a prima facie case is not an onerous one. *Pitre v. Western Elec. Co., Inc.,* 843 F.2d 1262, 1265 (10th Cir.1988).

The defendant's reliance on *Weber v. United Parcel Service, Inc. et al.,* 1993 WL 245969 (D.Kan.), is not persuasive. The court in *Weber* found that hiring an individual within the plaintiff's protected class is such strong evidence of the absence of discriminatory animus that it precludes the existence of a genuine issue of unlawful motive.

*Weber* is more expansive than prevailing law and the court finds the assertion "that a member of a protected class was hired or promoted in place of a Title VII plaintiff has repeatedly been held insufficient to insulate the employer from liability," articulated in *Pitre* more persuasive. *Pitre,* 843 F.2d at 1272. The court, therefore, rejects defendant's argument and finds that Blong has established a prima facie case.

■ The establishment of a prima facie case raises a rebuttable presumption of discrimination. *Burdine, supra,* 450 U.S. at 254, 101 S.Ct. at 1094. Once a plaintiff has made a prima facie showing, the burden shifts to the defendant to produce a facially non-discriminatory reason for failing to hire the plaintiff. *See E.E.O.C. v. Flasher Co., Inc.,* 986 F.2d 1312, 1316 n. 4 (10th Cir.1992) (discussion of the 10th Circuit's preference for the phrase "facially non-discriminatory.").

Defendant has articulated a reason that "is not on its face, prohibited by Title VII." *Id.* Specifically, defendant has stated from the beginning that a larger pool of qualified applicants was needed in order to assure the hiring of the best qualified applicant for the position. From a pool of one, the defendant was literally given no choice in the selection. The court knows of no Title VII provision which requires an employer to select from a pool of one or face discrimination charges. Such a requirement would result in employers being forced to hire individuals, who though minimally qualified, might be ill-suited for the position.

In addition, defendant articulated other facially non-discriminatory reasons for not hiring Blong. These include: (1) a poor inter-

view performance evidenced by her tardiness, inappropriate dress, general lack of good grooming, her negative attitude and lack of cooperation; (2) her known reputation of being difficult to work with; and (3) her history of tardiness and penchant for treating people in an unprofessional and discourteous manner.

Defendant clearly met its burden of articulating facially nondiscriminatory reasons for not hiring the plaintiff. "Once the defendant has set forth a facially nondiscriminatory reason ... the plaintiff then assumes the normal burden of any plaintiff to prove his or her case at trial." *Flasher Co.*, 986 F.2d at 1316.

In this case, Blong was required to prove, by a preponderance of the evidence, that defendant's failure to hire her was the result of intentional discrimination based on her gender. *See Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. Any presumption in plaintiff's favor that arose from her establishment of the prima facie case simply "drops from the case." *Id.* at 255 n. 10, 101 S.Ct. at 1095 n. 10. From this legal plane, the plaintiff cannot and did not prove that the defendant did not hire her as the result of intentional discrimination based on her gender.

Defendant did not hire her because the KANG wished to have a larger pool of candidates from which to choose the best qualified person. When the position was reannounced, a larger pool was amassed and a better qualified candidate was hired. Plaintiff, although she knew of the reannouncement, did not avail herself of the opportunity to be part of that larger pool. The defendant can decline to select a candidate for any reason so long as that reason does not discriminate against an individual because of race, religion, sex, or national origin. *Local 28, Sheet Metal Workers v. EEOC*, 478 U.S. 421, 462 n. 35, 106 S.Ct. 3019, 3043 n. 35, 92 L.Ed.2d 344 (1986). Defendant's desire to have a larger pool of applicants is not discriminatory.

Furthermore, there was substantial, credible evidence that plaintiff interviewed badly, was poorly groomed, displayed a negative attitude, and had a history of being uncooperative and difficult to work with. These are legitimate, non-discriminatory reasons for not hiring an individual, even one who meets the minimum qualifications required for the position. *Frausto v. Legal Aid Soc. of San Diego, Inc.*, 563 F.2d 1324, 1328 (9th Cir. 1977) (no racial discrimination shown where attorney for vacancy interviewed poorly, had an unstable work history, had a poor reputation in the legal community, and displayed an inability to get along with others); *Duplessis v. Training & Development Corp.*, 835 F.Supp. 671, 681 (D.Me.1993) (employer's decision not to rehire individual who was unable to work well with others was not motivated by individual's ancestry); *Burrus v. United Telephone Co. of Kansas, Inc.*, 683 F.2d 339, 342 (10th Cir.), *cert. denied*, 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982) (subjective evaluation that plaintiff lacked required ability to get along with others was a legitimate business reason for failure to hire and was amply supported by evidence and was not rebutted by any showing of pretext).

Plaintiff produced no direct evidence of intentional discrimination. She attempted to show by indirect evidence: (1) that CWO Cordwell was the lone decision maker when she was not hired, (2) that he held stereotypical views of women, (3) that he treated Blong differently than he treated Dan Piper, who had previously held the position for which Blong was an applicant; and (4) that Cordwell's reasons for not hiring Blong were unbelievable and a pretext for discrimination.

However, the evidence clearly shows that the hiring and firing of individuals in the KANG follows a specific chain of command and that chain was followed in this case. Second, plaintiff's evidence which attempted to show that Cordwell held stereotypic views of women was negligible at best and was counterbalanced by considerable testimony of how well he treated the women who worked for him and how much he appreciated their work. Third, plaintiff's evidence of how Cordwell treated Piper and plaintiff differently during the interview process is simply not relevant. Piper and plaintiff were not in the same job pool and any connection between the two interviews so far apart stretches any possible inferences beyond reasonable limits. Finally, plaintiff asks the

court to believe that defendant's witnesses were lying, that their testimony was canned and that there was a conspiracy to cover up defendant's intentional gender discrimination against plaintiff. The court finds such a proposition not only preposterous, but completely lacking in foundation.

The plaintiff has utterly failed to meet her burden of showing intentional gender discrimination and the court so holds.

Although it is unnecessary to the outcome of this case, as a point of clarification, the court addresses the defendant's argument concerning after acquired evidence of misconduct and misrepresentation by plaintiff.

Following discovery in this case, defendant became aware of plaintiff's prior misconduct which included misrepresentations made on her federal application, SF171. Defendant originally argued that the discovery of this misconduct barred plaintiff from any recovery in this case.

During the pendency of this case, however, the United States Supreme Court decided *McKennon v. Nashville Banner Publishing Co.,* —— U.S. ——, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995). The court held that after acquired evidence of plaintiff's misconduct is not a complete bar to recovery in an action brought pursuant to the Age Discrimi-

nation in Employment Act ("ADEA") of 1967. The evidence must be taken into account in determining the specific remedies available to the employee. Generally, reinstatement nor front pay is an appropriate remedy for an employee who engaged in misconduct that is discovered during litigation. *Id.* at ——, 115 S.Ct. at 887.

Although *McKennon* is an ADEA case, it seems clear that it would apply in an employment discrimination context should plaintiff prevail. Here because plaintiff has not prevailed, the rules of *McKennon* will not be applied.

## V. CONCLUSION

The court finds that plaintiff's complaint of gender discrimination is without merit.

**IT IS THEREFORE BY THE COURT ORDERED** that the clerk enter judgment for the defendant in this action pursuant to 42 U.S.C. § 2000e *et seq.*